**FILED**

OCT - 7 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# United States District Court
## For the District of Columbia

Don Hamrick, *pro se*
5860 Wilburn Road
Wilburn, AR 72179

   Petitioner

v.

Vice Admiral David L. Brewer III, USN
Commander
Military Sealift Command
914 Charles Morris Ct. SE
Washington Navy Yard, DC 20398-5540

Peter Lawrence, President
American Overseas Marine
General Dynamics
116 E. Howard St.,
Quincy, MA 02169
Fax Number: (617) 773-4436

Robert C. Wattam, Master
USNS FISHER
(Address refused)

   Respondents

)
)
) CIVIL ACTION: _____
) JUDGE: _____
) DECK TYPE: _____
) DATE STAMP: _____
)
)
) DAMAGES SOUGHT: $1 MILLION
)
)
)

 CASE NUMBER   1:05CV01993

 JUDGE: Henry H. Kennedy

 DECK TYPE: TRO/Preliminary Injunction

 DATE STAMP: 10/07/2005

) *Univis Lens Co.*, 316 U.S. 241, 254 (1942).
)
) **EXEMPT FROM FILING FEE UNDER:**
) **SEAMEN'S SUIT LAW 28 U.S.C. § 1916**
)
)
)

*JURY ACTION*

**COMPLAINT (1)** OF BREACH OF CONTRACT

**COMPLAINT (2)** OF AGE DISCRIMINATION IN VIOLATION OF THE
AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA)

**COMPLAINT (3)** OF SOLICITATION TO COMMIT MEDICAL FRAUD, HARASSMENT/BULLYING,
DEFAMATION/RITUAL DEFAMATION IN VIOLATION OF THE LABOR-MANAGEMENT AGREEMENT
BETWEEN AMSEA AND THE SEAFARERS INTERNATIONAL UNION

**COMPLAINT (4)** OF RELIGIOUS DISCRIMINATION IN VIOLATION OF THE
RELIGIOUS FREEDOM RESTORATION ACT (RFRA)

**COMPLIANT (5)** OF NEGLIGENCE IN THE ENFORCEMENT OF
FEDERAL LAWS AGAINST INTERNET CHILD PORNOGRAPHY

**COMPLAINT (6)** OF WRONGFUL/MALICIOUS DISCHARGE/FIRING IN VIOLATION OF
*TITLE VII* RETALIATION FOR REPORTING THE 5-YEAR EXISTENCE OF A CHILD PORN
PHOTOGRAPH ON THE CREW'S EMAIL COMPUTER ABOARD THE USNS FISHER TO THE U.S.
COAST GUARD IN ACCORDANCE WITH 46 U.S.C. § 2114, *PROTECTION OF SEAMEN AGAINST
DISCRIMINATION* (ALSO KNOWN AS THE WHISTLE BLOWER'S LAW FOR SEAMEN)
AS REQUIRED BY FEDERAL LAW, 18 U.S.C. § 4, *MISPRISION OF FELONY*

**COMPLAINT (7)** OF HUMILIATION (DEFAMATION/RITUAL DEFAMATION) AND FALSE/WRONGFUL
DETENTION AND/OR FALSE IMPRISONMENT BY CONFINEMENT TO QUARTERS UNDER
CONTINUOUS MILITARY GUARD WHILE ABOARD SHIP PRIOR TO DISCHARGE BY ORDER OF THE
MASTER IN *TITLE VII* RETALIATION FOR MAKING SUCH LAWFUL REPORT TO AUTHORITIES

# Table of Contents

REPRESENTATIONS TO THE COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BASIS FOR JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

VENUE AND PROCESS 18 U.S.C. § 1965 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Implied Waiver of Venue and Jurisdiction Based on Diversity of State Citizenship By the
   Master's Refusal to Provide the Plaintiff with His Mailing Addresses for the Purpose of
   Service of Summons with the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATING THE CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   Complaint/Claim (1) Breach of Contract as Cause of Action
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   Complaint/Claim (2) of Age Discrimination in Violation of the Age Discrimination in
      Employment Act (ADEA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   Complaint/Claim (3) of Solicitation to Commit Medical Fraud, Harassment/Bullying,
      Defamation/Ritual Defamation in Violation of the Labor-Management
      Agreement Between AMSEA and the Seafarers International Union . . . . . . . . . . . 8

   Complaint/Claim (4) of Religious Discrimination in Violation of the Religious
      Freedom Restoration Act (RFRA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   Compliant/Claim (5) of Negligence in the Enforcement of Federal Laws Against Internet
      Child Pornography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   Complaint/Claim (6) of Wrongful/Malicious Discharge/Firing in Retaliation for
      Reporting the 5-year Existence of a Child Porn Photograph on the Crew's
      Email Computer Aboard the USNS FISHER to the U.S. Coast Guard in
      Accordance With 46 U.S.C. § 2114, Protection of Seamen Against
      Discrimination (Also Known as the Whistle Blower's Law for Seamen)
      as Required by Federal Law, 18 U.S.C. § 4, *Misprision of Felony* . . . . . . . . . . . . 9

   Complaint/Claim (7) of Humiliation (Defamation/Ritual Defamation), and False/Wrongful
      Detention and/or False Imprisonment by Confinement to Quarters Under
      Continuous Military Guard While Aboard Ship Prior to Discharge by Order
      of the Master in Retaliation For Making Such Lawful Report to Authorities . . . . . . 10

BACKGROUND INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   British Seafarers' Union NUMAST's EQUAL OPPORTUNITIES POLICY . . . . . . . . . . . . . . . . . 11

   NUMAST POLICY ON MUTUAL RESPECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   Guidelines on NUMAST's POLICY ON MUTUAL RESPECT . . . . . . . . . . . . . . . . . . . . . . . 12

   WHAT IS BULLYING? From the European Community Shipowners' Associations
      and the European Transport Workers' Federation' brochure in 15 languages
      titled *EQUALITY OF OPPORTUNITY & DIVERSITY IN THE EUROPEAN SHIPPING
      INDUSTRY ELIMINATING WORKPLACE HARASSMENT & BULLYING: GUIDELINES TO
      SHIPPING COMPANIES.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   Bullying in the Workplace. The Canada Safety Council,(Canada's Voice and
      Resource for Safety) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

RECOMMENDED READING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

THE BULLY'S EFFECT ON CULTURE THROUGH POETRY . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Bully and Mates; Newcastle City Council, Education and Libraries: Children Against
        Bullying in Schools . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Bully in the Alley, (Canada) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Bully in the Alley, (United States, Traditional Lyrics) . . . . . . . . . . . . . . . . . . . . . . . . 21

    Bully in the Alley, (Music Score) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    The God Complex of Some Chief Mates, (Poem by Plaintiff) . . . . . . . . . . . . . . . . . . . 23

    Justice Ruth Bader Ginsburg: Helling From the Tower of Babel by Plaintiff Don Hamrick  26

    "Cataclysms" (*A poem in Diamante form*)by Plaintiff Don Hamrick . . . . . . . . . . . . . . 27

THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    The Discharge Letter Annotated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    Possible Crimes Committed by the Master . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    American Jurisprudence 2d ON VARIOUS SUBJECTS . . . . . . . . . . . . . . . . . . . . . . . . 34

        Prevention of Performance as Breach (17A Jur 2d § 717 . . . . . . . . . . . . . . . 34

        Retaliation Prohibited by Title VII of the Civil Rights Act of 1964 (42 U.S.C.
           § 2000e-3(a)) (45A Am Jur 2d § 215 . . . . . . . . . . . . . . . . . . . . . . . 34

        Preliminary Injunctive Relief (45C Am Jur 2d § 2569 . . . . . . . . . . . . . . . . 35

        Evidence - Habit or Routine Practice (Rule 406) (29 Am Jur 2d § 390 . . . . . . . . 36

        Elements of Habit (29 Am Jur 2d § 393) . . . . . . . . . . . . . . . . . . . . . . . . 36

        Routine Practice of Organization (29 Am Jur 2d §394) . . . . . . . . . . . . . . . . 37

        Industry Customs and Standards (29 Am Jur 2d § 395) . . . . . . . . . . . . . . . 37

    Case Law on Free Exercise of Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    What the Bible Says About Pornography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    Stating the Obvious: Protecting Religion for Religion's Sake . . . . . . . . . . . . . . . . . . 39

    Maritime Education and Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    The Practice of Ritual Defamation
        How Values, Opinions and Beliefs Are Controlled in Democratic Societies . . . . . . 44

THE NATURE OF THE RELIEF SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

APPENDIX 1 - EMAIL #1 FROM PLAINTIFF TO US COAST GUARD . . . . . . . . . . . . . . . . . . . 51

APPENDIX 2 THE DISCHARGE LETTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

APPENDIX 3 PLAINTIFF'S LETTER REQUESTING MILITARY REVIEW . . . . . . . . . . . . . . . . . . 55

APPENDIX 4 CASE PRECEDENCE ON BULLYING IN THE WORKPLACE . . . . . . . . . . . . . . . . . 56

APPENDIX 5: WORKPLACE PROBLEMS INCLUDE BULLYING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

APPENDIX 6: COMSC INST. 5235.1A INTERNET USE GUIDANCE . . . . . . . . . . . . . . . . . . . . . . . . 60

APPENDIX 7: CHILD PORN RISING ON THE WEB

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

APPENDIX 8: WHO HASN'T NOTICED? CHILD PORN ALREADY ILLEGAL . . . . . . . . . . . . . . . . . . . . 67

APPENDIX 9: 18 U.S.C. § 2252 SEXUAL EXPLOITATION AND OTHER ABUSE OF CHILDREN . . . . . . . . 70

APPENDIX 10: 18 U.S.C. § 2252A SEXUAL EXPLOITATION AND OTHER ABUSE OF CHILDREN . . . . . . 72

APPENDIX 11: 46 U.S.C. § 2000bb RELIGIOUS FREEDOM RESTORATION . . . . . . . . . . . . . . . . . . . . 75

APPENDIX 12: STATE DEPARTMENT'S OPTIONAL PROTOCOL TO THE U.N. CONVENTION ON THE RIGHTS OF
    THE CHILD ON THE SALE OF CHILDREN, CHILD PROSTITUTION, AND CHILD PORNOGRAPHY . . 77

APPENDIX 13: FBI TO INVESTIGATE PORNOGRAPHY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

APPENDIX 14: WASHINGTON POST RIDICULING FBI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

APPENDIX 15: BEN SHAPIRO COMMENTARY BLASTING WASHINGTON POST . . . . . . . . . . . . . . . . . . 83

APPENDIX 16: ABA - HALF OF U.S. SEES 'JUDICIAL ACTIVISM CRISIS' . . . . . . . . . . . . . . . . . . . . . . 85

# TABLE OF AUTHORITIES

### INTERNATIONAL TREATIES

The Optional Protocol to the United Nations Convention on the Rights of the Child on the
Sale of Children, Child Prostitution, and Child Pornography . . . . . . . . . . . . . . . . . . . . . . . 77

### FEDERAL CASES

*Ackel v. National Communications, Inc.*, C.A.5 (La) 2003, 339 F.3d 376, rehearing and
rehearing in banc denied 84 Fed.Appx. 472, 2003 WL 22345107 . . . . . . . . . . . . . . . . . 9

*Ackel v. National Communications, Inc., Inc.*, C.A.5 (La) 2003, 339 F.3d 376, rehearing and
rehearing in banc denied 84 Fed.Appx. 472, 2003 WL 22345107 . . . . . . . . . . . . . . . . 34

*Burt v. City of New York*, 2Cir., (1946) 156 F.2d 791 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dioguardi v. Durning*, 2 CIR., (1944) 139 F2d 774 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*John Edward Crockard v. Publishers, Saturday Evening Post Magazine of Philadelphia,
PA* (1956) Fr Serv 29, 19 F.R.D. 511, DCED Pa 19 (1958) . . . . . . . . . . . . . . . . . . . . . . . 3

*Pankey v. Webster*, W.D.Mo. 1993, 816 F.Supp. 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Stein v. Brotherhood of Painters, Decorators, and Paper Hangers of America*, DCCDJ (1950),
11 F.R.D. 153. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Baez*, C.A.10 (Okla) 1984, 732 F.2d 780 . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Ciambrone*, C.A.9 (Nev.) 1984, 750 .2d 1416 . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. DeWitt*, C.A.8 (Mo.) 1996, 95 F.3d 1374 . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Johnson*, C.A.5 (Tex) 1977, 546 F.2d 1225 . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Perlstein*, C.C.A.3 (N.J.) 1942, 126 F.2D 789, certiorari denied 62 S.Ct. 1106,
316 U.S. 678, 86 L.Ed. 1752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

### FEDERAL STATUTES

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 1035 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 1965 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2252 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 2252A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 241 and 242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 245(b)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 33

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1343(a)(1) through (4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1916 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. §1346(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1402(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 2000e-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 34

46 U.S.C. § 2114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 34

46 USC § 1295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Title VII of the Civil Rights Act of 1964 . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

**OTHER AUTHORITIES**

Frank E. Bassett and Richard A. Smith, *FAREWELL'S RULES OF THE NAUTICAL ROAD*,
    Naval Institute Press, 6th Edition (Pages 350-351);
        Chapter 20: A Proper Lookout (Rule 5) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Special Circumstances* of Rule 2 of the International Rules of Navigation . . . . . . . . . . . . . . . 28

Title VII of the Civil rights Act of1964 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**LAW REVIEWS**

Gregory C. Sisk, *STATING THE OBVIOUS: PROTECTING RELIGION FOR RELIGION'S SAKE*,
    47 Drake Law Review 45 (1998) (Constitutional Law Symposium on
    The Role of Freedoms) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## REPRESENTATIONS TO THE COURT

In accordance with Rule 11(b) Plaintiff hereby certifies that by presenting to the U.S. District Court for the District of Columbia this civil action that it is Plaintiff's affirmation it is the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions herein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support (i.e., the related case as noted above) or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

## BASIS FOR JURISDICTION

***CIVIL ACTION FOR DEPRIVATION OF RIGHTS:*** This is a civil cause of action under 42 U.S.C. § 1983 for deprivation of rights under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, and/or for deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.

***TO RECOVER DAMAGES:*** The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person Under 28 U.S.C. § 1343(a)(1) through (4).

***ON A FEDERAL QUESTION:*** The U.S. District Court for the District of Columbia has original jurisdiction in this civil action arising under the United States Constitution, laws, or treaties of the United States in accordance with 28 U.S.C. § 1331.

***WHEN THE UNITED STATES IS A DEFENDANT:*** Because this civil action includes a tort claim against the United States under 28 U.S.C. §1346(b)(1) this case may be prosecuted wherein the act or omission complained of occurred. In the interest of justice the Plaintiff waives his right of venue under

28 U.S.C. §1402(a)(1) since the act or omission complained of occurred aboard a vessel of the U.S. Government in the Persian Gulf en route to Kuwait delivering military cargo to the U.S. forces in Iraq. Under these circumstances the Plaintiff affirms that the U.S. District Court for the District of Columbia has jurisdictional priority over the U.S. District Court for the Eastern District of Arkansas, the state where the Plaintiff resides which would have been in accordance with 28 U.S.C. §1402(a)(1).

*POTENTIAL EXISTS FOR INTERVENTION BY ATTORNEY GENERAL; DENIAL OF EQUAL PROTECTION ON ACCOUNT OF RELIGION:* This civil action was commenced by the Plaintiff, *pro se,* in the U.S. District Court for the District of Columbia seeking relief from the denial of equal protection of the laws under the Fourteenth Amendment to the Constitution on account of religion. The Attorney General for or in the name of the United States may intervene in this action upon timely application if the Attorney General certifies that this case is of general public importance. In such action the United States shall be entitled to the same relief as if it had instituted the action under 42 U.S.C. § 2000h-2.

## VENUE AND PROCESS 18 U.S.C. § 1965

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpoenas issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpoena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

## IMPLIED WAIVER OF VENUE AND JURISDICTION BASED ON DIVERSITY OF STATE CITIZENSHIP BY THE MASTER'S REFUSAL TO PROVIDE THE PLAINTIFF WITH HIS MAILING ADDRESSES FOR THE PURPOSE OF SERVICE OF SUMMONS WITH THE COMPLAINT

Respondents' hostile and uncooperative refusal to provide to the Plaintiff the address of their residence, or their agent, or their attorney, or the person who transacts their affairs in order to reduce the cost of service of Summons and Complaint is construed to be a waiver of their right to object on diversity grounds or other grounds to jurisdiction and venue of the U.S. District Court for the District of Columbia or to object to being served by a court appointed U.S. Marshal in accordance with Rule 4(c)(2) of the Federal Rules of Civil Procedure. Selection of the U.S. District Court for the District of Columbia only available address for the purpose of Service of Summons with the Complaint in accordance with Rule 4.

## STATING THE CLAIMS

"A complaint may not be dismissed on motion if it states some sort of claim, baseless though it may eventually prove to be, and inartistically as the complaint may be drawn. Therefore, under our rules, the plaintiff's allegations that he is suing in 'criminal libel' should not be literally construed. The complaint is hard to understand but this, with nothing more, should not bring about a dismissal of the complaint, particularly is this true where a defendant is not represented by counsel, and in view of rule 8(f) of the rules of civil procedure, 28 U.S.C., which requires that all pleadings shall be construed as to do substantial justice *Burt* v. *City of New York*, 2Cir., (1946) 156 F.2d 791. Accordingly, the complaint will not be dismissed for insufficiency. Since the Federal Courts are courts of limited jurisdiction, a plaintiff must always show in his complaint the grounds upon which that jurisdiction depends." *Stein* v. *Brotherhood of Painters, Decorators, and Paper Hangers of America*, DCCDJ (1950), 11 F.R.D. 153.

"A complaint will not be dismissed for failure to state a claim, even though inartistically drawn and lacking in allegations of essential facts, it cannot be said that under no circumstances will the party be able to recover." *John Edward Crockard* v. *Publishers, Saturday Evening Post Magazine of Philadelphia, PA* (1956) Fr Serv 29, 19 F.R.D. 511, DCED Pa 19 (1958).

"FRCP 8f: Construction of pleadings. All pleadings shall be so construed as to do substantial justice." *Dioguardi* v. *Durning*, 2 CIR., (1944) 139 F2d 774

3

<u>**Complaint/Claim (1)**</u> **Breach of Contract as Cause of Action**

The law will not permit a party to violate his contract with impunity, nor will the law sanction a breach of contract as a means of escaping its burdensome terms (17A Am Jur 2d § 716 - Footnotes omitted).

The master violated *Article I: Employment*; Section 1(G), *Personnel Covered*; Section 5, *No Discrimination*; Section 6, *Separability*; Section 10, *Discharge*; Section 27, *Manning Scale*; section of the contractual Agreement titled Memorandum of Understanding as of March 1, 1985 Between American Overseas Marine Corporation and Seafarers International Union Atlantic, Gulf, Lakes and Inland Waters District, AFL-CIO.

**Article I: Employment**

Section 1(G). *Personnel Covered*:

With respect to the vessels, the following manning scale[] shall apply:

Deck Department

1 Bosun (Boatswain)
1 AB Maintenance (Green ticket)
6 Able Bodied Seamen

Section 5. *No Discrimination*:

The Company agrees not to discriminate against any of the Unlicensed Personnel for legitimate Union activities, and further the Company and Union agree that no person referred in accordance with this Article or employed by the Company shall be discriminated against because of race, religion, color, sex, national origin, handicap, age and status as a disabled or Vietnam-era veteran.

Section 6. *Separability*:

The provisions hereof are subject to Federal and State Law and if any part hereof is in conflict therewith, such part shall be deemed inapplicable and to the extent thereof, shall be deemed severed from this Agreement, the remainder of which shall remain in full force and effect.

Section 10. *Discharge*:

(A) A crew member who is discharged for cause shall be given, on the date of discharge, a written statement advising of the discharge, and a detailed explanation of the reason for the discharge. ***Failure to furnish such a written statement will presumptively establish that the crew member hs bee discharged without just cause.***[1] Such statement must be furnished to the Union headquarters if the crew member is not available.

---

[1] Plaintiff's emphasis.

Section 27. *MANNING SCALE*:

The Company reserves the right to increase, decrease or reclassify the manning as it deems necessary.

## ARTICLE II. GENERAL RULES

Section 5. *MONETARY MATTERS*:

(A) Monthly base wages, Premium Rates, Overtime Rates and Penalty Rates shall be as follows:[2]

| Rating | Monthly Rate | Premium O/T Rate | Mon to Fri O/T Rate |
|---|---|---|---|
| Bosun | $2,939.12 | $24.16 | $13.84 |
| AB Maintenance | 2,209.91 | 18.41 | 10.60 |
| AB (Green ticket) | 1,978.87 | 16.53 | 10.60 |

| PENALTY RATES | | | |
|---|---|---|---|
| Rating | Group | On Watch Mon to Fri | Off Watch Mon to Fri |
| Bosun | 1 | $6.44 | $10.58 |
| AB Maintenance | 2* | 6.44 | 10.58 |
| AB (Green ticket) | 2 | 4.95 | 8.48 |

The Penalty Rates "On Watch Monday through Friday" shall apply to penalty meal hours, ship's committee meetings, restriction claims and delayed sailings.

When crew members are required to enter any tank in which water is regularly carried, for the purpose of cleaning or making repairs therein, they shall bepaid at the Penalty Rates specified above.

*PLAINTIFF'S COMMENTARY: Presumed to be a "typo." It should be Group 1. However, in Contract Law there can be no typos in a contract or agreement. Otherwise it would be excusably construed to be as agreed upon by the union and the company. In this example it can be construed that the Company has the right to employ Group 2 (Watchstanding) Able Seamen to fill the Group 1 (Day Worker) AB Maintenance position to be paid at the higher Group 1 rate while on watch. This interpretation is supported by the fact that on the USNS the Plaintiff was a Group 2 (Watchstanding) Able Seaman (12-4 Watch) and was required to work from 12:00 noon to 16:00 on deck in the holds. But the Plaintiff's pay voucher does not reflect this interpretation. The contract/agreement implies by omission that the Penalty Rates do not apply to AB on Watch working in the holds. The contract/agreement is excessively vague in this area of Watchstanding ABs working on watch. The concept of the Watchstanding AB working on watch as an industry custom began with the

---

[2] Updated Pay Scale effective January 1, 2004.

Watchstanding AB working only in the vicinity of the Bridge. Now the Company has taken that concept and expanded it to the entire ship in violation of Rule 5, Lookout, of the Inland and International Rules of Navigation.

Section 7. Hours of Labor:

1. Sea Watches for Watchstanding** crew members shall constitute four (4) hours. Two (2) such watches shall constitute a day's work.

**PLAINTIFF'S COMMENTARY: "FEDERAL QUESTION" under 28 U.S.C. § 1331 begs the question: *"Is working in the holds of a ship part of a Watchstanding Able Seaman's duties as a Helmsman or Lookout while on watch?"*

## AB ON WATCH WORKING ON WATCH?
## Vs.
## RULE 5, LOOKOUT OF THE INTERNATIONAL RULES OF NAVIGATION

Citing from Frank E. Bassett and Richard A. Smith, *FAREWELL'S RULES OF THE NAUTICAL ROAD*, Naval Institute Press, 6th Edition (Pages 350-351); Chapter 20: A Proper Lookout (Rule 5):

### Lookout Defined by Case Law:

A lookout has been defined by the federal court as a person who is specially charged with the duty of observing the lights, sounds, echoes, or any obstruction to navigation with the thoroughness that the circumstances permit. [The *Tillicum* (Wash 1914) 217 F. 976.] The words specially charged imply that such person shall have no other duties that detract in any way from the keeping of a proper lookout. Thus, it has been held in numerous cases that because the lookout must devote his attention to this duty, the officer of the deck or the helmsman cannot properly serve as lookout. [The *Kaga Maru* (Wash 1927) 18 F.2d 295; the *Donau* (Wash 1931) 49 F.2d 799.] Even on a slow-moving tug with a tow, the officer in charge of navigation is not legally complying with the duty by keeping a lookout from the pilot house. [The *City of Philadelphia* (Pa 1894) 62 F. 617; the *Sea Breeze*, Fed. Cas. No. 12,572a.] Where the captain of a steamer is acting at the same time as pilot and lookout, the vessel has not a proper lookout, and the owners may be liable for the damage caused by such omission. [*Bill v. Smith* (1872) 39 Conn 206; *Dahlmer v. Bay State Dredging & Contracting Co.* (CCA Mass 1928) 26 F.2d 603.] A seaman who had been dividing his attention between looking out and reefing sail was held not to be a vigilant lookout, [The *Twenty-one Friends* (Pa 1887) 33 190.] and where the only two men on the deck of a schooner navigating at night were engaged in taking down sail, it was held that neither one nor both seamen constituted a proper lookout, and accordingly, the schooner was at fault for colliding with another schooner having the right-of-way. [The *Fannie Hayden* (Me 1905) 137 F. 285.]

As noted in the case law on a proper Lookout above it would seem logical to the Plaintiff that the master's policy (or is it the company's policy?) to have one of the two ABs on watch to work on deck

all over the ship and in the holds would be a blatant violation of the above case law on Lookout, especially when a helmsman cannot serve as a lookout in a dual capacity.

This would dictate that an industry standard manning level of two ABs on watch for all U.S. registered vessels regardless of size would be the industry norm. How this policy of a manning scale allowing one AB on watch for smaller vessels and allowing the AB on watch to work on deck for any size vessel came about with the U.S. Coast Guard's approval is beyond the Plaintiff's understanding or awareness in the legal sense. Appeasement to the Company's bottom line cannot allow such leeway with safety of life at sea for the sake of higher profits.

It is the Plaintiff's belief that because of the transfer of the U.S. Coast Guard to the Department of Homeland Security there have been additional security burdens placed upon the unlicensed members of the SIU without any additional increase in the manning levels for U.S. flag vessels. Additionally there may or may not have been any additional increases in the pay scales reflecting the increase in security duties for the unlicensed members of the SIU.

## COMPLAINT/CLAIM (2) OF AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA) (45A Am Jur 2d § 160 - Footnotes omitted)

*The Plaintiff, Don Hamrick, is 50-years-old as of Septermber 15, 2005.*

The Age Discrimination in Employment Act (ADEA) prohibits age discrimination by employers as well as the states, their political subdivisions, and any interstate agencies, employment agencies, and labor organizations.

The firing of an older employee, because the employer believes that productivity and competence decline with age, is age discrimination within the prohibition of the ADEA. The ADEA commands that employers are to evaluate older employees on their merits and not their age, and employers may not rely on age as a proxy for an employee's remaning characteristics, such as productivity, but must focus on those factors directly. The "disparate treatment" theory of employment discrimination, which applies where the employer simply treats some people less favorably than others because of their race, color, religion, or other protected characteristic, is available under the ADEA.

The Equal Employment Opportunity Commission has declared that the ADEA forbids age discrimination not only against older employees in favor of younger employees, but also between protected individuals themselves. Thus, if two people apply for the same position, and one is 42 and the other 52, the employer may not lawfully turn down either one on the basis of age, but must make

such decision on the basis of some other factor. The ADEA's prohibitions are limited to indiviuals who are at least 40 years of age.

**COMPLAINT/CLAIM (3) OF SOLICITATION TO COMMIT MEDICAL FRAUD, HARASSMENT/BULLYING, DEFAMATION/RITUAL DEFAMATION IN VIOLATION OF THE LABOR-MANAGEMENT AGREEMENT BETWEEN AMSEA AND THE SEAFARERS INTERNATIONAL UNION**

As evidenced in the master's discharge letter the master confessed to conspiring with the company whereupon both the company and the master agreed to offer the Plaintiff a mutual consent discharge on medical grounds for a bad back. This offer was made even after the fact that the Plaintiff advised that the condition of his back was merely and simply athletically out-of-condition for lack of exercise while out of work between ships for two months and not the condition was, in fact and law, not a medical condition. The Plaintiff's explanation was ignored. The offer of mutual consent was made in defiance of the facts and could quite possibly be construed as entrapment to commit medical fraud and the basis that the Plaintiff did explain the facts and the master and company could have been attempting to catch the Plaintiff on charges of medical fraud by taking the mutual consent offer so that the master an the company would have counter-allegations against the Plaintiff's case in Court. The Plaintiff construes from this the criminal allegations of 18 U.S.C. § 241 and 242.

**COMPLAINT/CLAIM (4) OF RELIGIOUS DISCRIMINATION IN VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT (RFRA)**

When the Plaintiff discovered the hundreds of screensaver Playboy photos of adult women and the one photo of what appeared to be an under-age child of about 12 or 13-years-of-age the Plaintiff's religious sense of duty was evoked and the Plaintiff performed his religious duty to protect children from abuse. This religious duty to protect others who cannot protect themselves is a duty sanctioned by God as evidenced by certain passages in the King James Bible. This duty overrides any law of man or prejudicial orders of ship's masters who would protect the shipping company ahead of protecting children from abuse and exploitation as evidence in the master's discharge letters and as may be further evidenced if the harddrive of the crew's email computer is found to be clear of the pornographic photographs reported by the Plaintiff. The Plaintiff has filed for subpoena/search warrant for that harddrive as evidence to be subjected to data extraction and recovery to support Plaintiff's case.

8

## COMPLIANT/CLAIM (5) OF NEGLIGENCE IN THE ENFORCEMENT OF FEDERAL LAWS AGAINST INTERNET CHILD PORNOGRAPHY

The fact that there are (are were if the Master did not order the email computer sanitized of pornography files) hundreds of Bitmap (BMP) Playboy type photos of adult women on the vessel's crew email computer saved under the folder of a screensaver program does not violate company or MSC policy may or may not be debatable but the existence of the one BMP photo of an apparent under-age child violates without a doubt federal laws against child pornography. The 5-year existence of this photo on this emial computer implicates Military Sealift Command, the previous operating company prior to AMSEA, and AMSEA for negligence in failure to comply with federal anti-pornography laws.

### TITLE VII RETALIATION

**CASE LAW:** In order to establish a prima facie claim of Title VII retaliation, an employee must show: (1) that the employee engaged in activity protected by Title VI; (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action. *Ackel v. National Communications, Inc.*, C.A.5 (La) 2003, 339 F.3d 376, rehearing and rehearing in banc denied 84 Fed.Appx. 472, 2003 WL 22345107.

## COMPLAINT/CLAIM (6) OF WRONGFUL/MALICIOUS DISCHARGE/FIRING IN RETALIATION FOR REPORTING THE 5-YEAR EXISTENCE OF A CHILD PORN PHOTOGRAPH ON THE CREW'S EMAIL COMPUTER ABOARD THE USNS FISHER TO THE U.S. COAST GUARD IN ACCORDANCE WITH 46 U.S.C. § 2114, PROTECTION OF SEAMEN AGAINST DISCRIMINATION (ALSO KNOWN AS THE WHISTLE BLOWER'S LAW FOR SEAMEN) AS REQUIRED BY FEDERAL LAW, 18 U.S.C. § 4, MISPRISION OF FELONY

The master discriminated against the Plaintiff in violation of 46 U.S.C. § 2114, *PROTECTION OF SEAMEN AGAINST DISCRIMINATION*, because the Plaintiff reported the 5-year existence of a child porn photograph to the U.S. Coast Guard only after an incident of harassment occurred after reporting the existence of said child porn photograph to master via the third mate.

The Plaintiff has discovered from his 17 years of experience as an able seaman that an ignorant and submissive unlicensed able seaman to the extent that such a person does not recognize the circumstances of harassment or bullying or willingly or is coerced into tolerating such treatment is the preferred employee by masters, licensed officers, and by shipping companies. This subjective empirical finding by the Plaintiff is supported by clinical and industry studies worldwide, some of which are included herein. The Plaintiff's finding is also supported by his own first-person experience with contrasting evidence that he educated himself extensively in seamen's rights, civil rights, constitutional

law, and the Bill of Rights because he has been pushing a Second Amendment case through the federal courts for the last three (3) years. He has twice reached the U.S. Supreme Court only to be denied twice.

He has learned to recognize unlawful harassment and bullying in the workplace, and to recognize criminal activity based upon direct and circumstantial evidence as required under 18 U.S.C. § 4, MISPRISION OF FELONY. The extent of the Plaintiff's education presents an obstacle to licensed officers and to companies who desire to turn a blind eye and do nothing out of the ordinary schedule of the ship's routine. The Plaintiff has learned that more often than not that when an unlicensed able seaman stands up to licensed officers behaving in a harassing and bullying manner in defense of his own dignity and his own right to a workplace free of harassment and bullying that such defensive action causes more of the same harassment and bullying and is wrongfully construed by the licensed officers that the unlicensed able seaman is being insubordinate to the licensed officer.

The United States Congress passed two laws to protect seaman from such ruthless licensed officers and companies: (1) the seamen's whistle blower's law, 46 U.S.C. § 2114, and (2) the Seamen's Suit law, 28 U.S.C. § 1916, in addition to the duty of citizenship required of every U.S. citizen for the enforcement of law and order, 18 U.S.C. § 4, MISPRISION OF FELONY.

**COMPLAINT/CLAIM (7) OF HUMILIATION (DEFAMATION/RITUAL DEFAMATION), AND FALSE/ WRONGFUL DETENTION AND/OR FALSE IMPRISONMENT BY CONFINEMENT TO QUARTERS UNDER CONTINUOUS MILITARY GUARD WHILE ABOARD SHIP PRIOR TO DISCHARGE BY ORDER OF THE MASTER IN RETALIATION FOR MAKING SUCH LAWFUL REPORT TO AUTHORITIES**

The master wrongfully and maliciously discharged the Plaintiff in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a)), DISCRIMINATION FOR MAKING CHARGES, TESTIFYING, ASSISTING, OR PARTICIPATING IN ENFORCEMENT PROCEEDINGS, because the Plaintiff reported the 5-year existence of a child porn photograph to the U.S. Coast Guard only after an incident of harassment occurred after reporting the existence of said child porn photograph to master via the third mate, as such reporting activity is protected by Title VII.

## BACKGROUND INFORMATION

The Plaintiff has been an able seaman for seventeen (17) years now. In those years he has witness a great many forms of abusive human behavior of licensed and unlicensed crew members. The Plaintiff has been an occasional recipient of this abuse. Call it what you will: harassment or bullying in the workplace. During the first 14 years as an able seaman he has had the occasional experience with the union grievance procedure. What he has learned is that neither the companies' diligent obedience

10

to their own policies on harassment or the union's grievance procedure are essentially ineffective for several reasons.

The first reason, the Plaintiff believes, is that permanent Boatswain and permanent AB positions that were created to satisfy the companies' desire to keep a select set of crew members. In the long term these permanent crew members drift away from their union obligations in their labor-management contractual obligations, especially in regard to monthly union meetings aboard ship and enforcing the proper execution of the union grievance procedure. These permanent crewmembers become more of company employees than a union members.

The second reason, the Plaintiff believes, is the propensity of a deck officer or the master to abuse, harass, and/or bully the unlicensed crew or individuals of the crew with impunity due to the isolated nature of the workplace aboard the ship at sea. There are no immediate resources for dispute resolution aboard a ship at sea. The victim of such conduct must endure it at great cost to one's own dignity, reputation, self-respect, and misery.

The third reason, the Plaintiff believes, is bias in the company's *designated person* to resolve disputes that cannot be settled aboard ship. Even when the evidence brought forth by the unlicensed victim of workplace harassment or bullying by a fellow union member, a licensed officer or the master himself, the *designated person* generally resolves the dispute in the company's favor or ignores the dispute, i.e., whitewashing tht dispute with no punitive measures taken against the wrongdoer.

This has become an industry-wide problem. Moreover, it has become a world-wide epidemic demanding serious reforms in the maritime industry through the United Nations and the Internationl Maritime Organization. The British seafarers' union, NUMAST, adopted a new policy to combat harassment and bullying aboard ship at sea. Note that the term "bullying" is a form of harassment that is not typically addressed in policy matters in the United States. NUMAST's bulletin states:

---

### BRITISH SEAFARERS' UNION NUMAST's EQUAL OPPORTUNITIES POLICY

NUMAST Council members have adopted a policy on mutual respect, together with associated guidelines, to further develop its statement on equal opportunities, agreed in March 2000.

The policy forms a key part of the Union's strategy for progressing equal opportunities within the shipping industry, as well as underpinning its commitment to equal opportunities within NUMAST as an employer and as an organisation.

Further elements of the Union's strategy include the development of joint industry guidelines to combat harassment and bullying in the shipping industry, as well as material to support the creation of an equal opportunities culture in the maritime sector.

## NUMAST POLICY ON MUTUAL RESPECT

NUMAST is opposed to any discrimination based on age, colour, disability, marital status, nationality, gender, sexual orientation, religion, race or creed and has adopted a statement on equal opportunities to give effect to this commitment.

Among trade unionists there is a very high degree of appreciation of the need to respect the dignity of every individual. Nevertheless, in all organisations there should always be vigilance to ensure that all participants in NUMAST's meetings and events feel they are able to work in an atmosphere in which they feel comfortable and safe.

NUMAST is committed to creating and maintaining a working environment based on dignity and mutual respect. NUMAST neither condones nor tolerates behaviour that undermines the dignity or self esteem of any individual or creates an intimidating, hostile, abusive or offensive environment. This commitment applies to all delegates and participants, women and men, in NUMAST meetings, activities and social gatherings wherever they may take place.

As an employer, NUMAST has a legal as well as moral responsibility to protect its employees from any form of harassment, abuse or similarly unacceptable behaviour. This applies to the working environment in London and Wallasey and to NUMAST meetings wherever they are held. It also applies to social occasions where the attendance of NUMAST staff is linked to their employment and where NUMAST is liable as an employer.

## GUIDELINES ON NUMAST's POLICY ON MUTUAL RESPECT

NUMAST is committed to creating and maintaining a working environment based on dignity and mutual respect and Council has adopted a statement on Equal Opportunities giving effect to this commitment.

In all organisations there should always be vigilance to ensure that all members of staff and participants in NUMAST meetings feel they are able to operate in an atmosphere in which they feel comfortable and safe. This should apply to meetings, socialising and all the events around NUMAST activities.

**What we ask of you**

- To treat everybody, including other members, as well as NUMAST Officials and staff members, with respect and dignity

- To make absolutely sure your own behaviour does not cause offence or misunderstandings

- To think before you make personal remarks

- To accept responsibility for challenging all forms of unacceptable and offensive behaviour, and for upholding personal dignity

**What is unacceptable behaviour?**

Unacceptable behaviour includes unwelcome physical, verbal or non-verbal conduct including the use of e-mail and any behaviour that ridicules, intimidates or is physically abusive.

This may have as its focus such things as:

- Race, ethnic origin, nationality and skin colour
- Gender or sexual orientation
- Disabilities or sensory impairments
- Age, health or physical characteristics
- Religious or political beliefs

This may involve such forms of unwanted behaviour as:

- Unwanted physical contact
- Physical or sexual assault
- Sexual or compromising propositions
- Racist, sexist or religious jokes
- Offensive language, insults and obscene gestures
- Unwelcome gifts
- Intrusion by pestering or stalking

These lists are not definitive.

We are aware that among trade unionists there is a very high degree of appreciation of the need to respect the dignity of every individual. We welcome your cooperation in our practical efforts for making NUMAST as a workplace and all NUMAST meetings a positive experience for everyone.

---

**WHAT IS BULLYING?** From the European Community Shipowners' Associations and the European Transport Workers' Federation' brochure in 15 languages titled *EQUALITY OF OPPORTUNITY & DIVERSITY IN THE EUROPEAN SHIPPING INDUSTRY ELIMINATING WORKPLACE HARASSMENT & BULLYING: GUIDELINES TO SHIPPING COMPANIES.*

Bullying is also harassment and is used to describe a threatening or intimidating work environment in which a group of people or an individual may become fearful or intimidated because of the negative or hostile behaviour of another group of people or individual.

Bullying often involves a misuse of power or position and is often persistent and unpredictable. It may be vindictive, cruel or malicious. However it can also arise when a person is unaware of the effect that their behaviour is having on other persons, or does not have any intention to bully.

## EXAMPLES OF BULLYING

- verbal or physical threats or abuse, such as shouting or swearing at staff or colleagues, either in public or in private, including derogatory or stereotyped statements or remarks;

- personal insults;

- belittling or ridiculing a person, or his /her abilities, either in private or in front of others;

- spreading malicious rumours about someone;

- sudden rages or displays of temper against an individual or group, often for trivial reasons;

- subjecting someone to unnecessarily excessive or oppressive supervision, monitoring everything they do or being excessively critical of minor things;

- persistent or unjustified criticism;

- making unreasonable demands of staff or colleagues;

- setting menial or demeaning tasks that are inappropriate to the job or taking away areas of responsibility from an individual for no justifiable reason;

- ignoring or excluding an individual e.g. from social events, team meetings, discussions and collective decisions or planning;

- making threats or inappropriate comments about career prospects, job security or performance appraisal reports.

The following expressions are sometimes used to excuse, define or refer to behaviour or situations between people at work which may involve "hidden" bullying:

- strong or robust management styles;

- a working relationship that is described as a " personality clash ";

- someone being described as "over-sensitive " or " unable to see a joke ";

- describing someone as having an " attitude problem ";

- a manager who "doesn't suffer fools gladly ";

- failure to support a member of staff who has made a minor mistake at work.

If any employee complains of having been the victim of any of the above acts or any other act falling within the definition of harassment and/or bullying, it is important that the employer takes the complaint seriously and carries out an investigation.

Excerpt from Case Studies Section

### Military Support Ship Operator

This operator produced a booklet entitled ***"Stop It! – Harassment and Bullying Will Not Be Tolerated"***,[3] which was issued to all members of staff. The booklet

---

[3] Plaintiff's emphasis. If a European military support ship operator can promote an anti-bullying policy then the Defendant American Overseas Marine Corporation, a United States military support ship operator, can

contains a personal message from the Commodore underlining his commitment to the policy. It includes a comprehensive list of examples of harassment and bullying and a checklist for staff members to consider whether aspects of their behaviour constitute harassment or bullying, unwittingly or otherwise. It also includes a list of seven people to whom staff members can speak if they are suffering harassment or bullying, some of whom are on board, some ashore, some external to the organization and some who are reached via a confidential telephone line.

In addition to the booklets, the operator organises seminars for all staff at which they are encouraged to recognise examples of harassment and bullying. The operator has produced a video concerning harassment and bullying, which is used at the seminars to generate discussion about the subjects.

---

## SUGGESTED TEXT OF LEAFLET FOR SEAFARERS

### Rights and responsibilities of seafarers

No worker should be harassed or bullied in their workplace. All workers have a responsibility for ensuring that their workplaces are free of harassment and bullying and your company takes these issues very seriously.

### Do you harass or bully other workers?

Harassment includes any act which creates feelings of unease, humiliation, embarrassment, intimidation or discomfort to the person on the receiving end.

Bullying includes any negative or hostile behaviour that makes a recipient feel fearful or intimidated.

### You may be unaware of the effect that your own actions have on other workers.

For example:

- do you consider that your way of doing a job is always right?
- do you raise your voice at other workers?
- are you sarcastic or patronising to other workers?
- do you criticise individuals in front of others?
- do you criticise minor errors and fail to give credit for good work?
- do you shun any other workers or spread rumours or malicious gossip?

If you are concerned that aspects of your behaviour could be considered harassment or bullying, your company will help you eradicate these aspects. However you should approach your line manager and seek assistance – don't wait until a complaint is made against you!

### Have you been harassed or bullied at work?

---

do the same thing.

Your company will treat all complaints of harassment and bullying seriously and in confidence.

Your line manager on board and personnel manager ashore have been trained in dealing with complaints of harassment and bullying. You may approach either or both to report any incidents you have suffered.

If you do not feel comfortable raising a complaint yourself, you may ask a friend or colleague to do so on your behalf.

You will not be victimised by the company for making a complaint, provided it is not vexatious or made malici ously.

Remember, it is the victim's perception of any actions that counts. If YOU feel you have suffered harassment or bullying, the company will act.

Name of the Company:

Contact person on board :

Contact person ashore :

---

**BULLYING IN THE WORKPLACE.** The Canada Safety Council,(Canada's Voice and Resource for Safety)

Employers are beginning to take steps to make bullying as unthinkable as sexual harassment or drunkenness in the workplace.

Schoolyard bullying - the torment of one child by another - is often compared to workplace bullying. Both types represent a grab for control by an insecure, inadequate person, an exercise of power through the humiliation of the target. School bullies, if reinforced by cheering classmates, fearful teachers or ignoring administrators, grow up to be dominating adults. When they join the work force, they continue to bully others.

### Psychological Violence

A 1999 International Labour Organization (ILO) report on workplace violence emphasized that physical and emotional violence is one of the most serious problems facing the workplace in the new millennium. The ILO definition of workplace violence includes bullying:

> "any incident in which a person is abused, threatened or assaulted in circumstances relating to their work. These behaviors would originate from customers, co-workers at any level of the organization. This definition would include all forms or harassment, bullying, intimidation, physical threats/assaults, robbery and other intrusive behaviors."

CUPE's National Health and Safety Survey of Aggression Against Staff, published in January, 1994, mentions verbal aggression and harassment in its definition of violence:

> "Any incident in which an employee is abused, threatened or assaulted during the course of his/her employment. This includes the application of force, threats with or without weapons, severe verbal abuse and persistent sexual and racial harassment."

Bullying (general harassment) is far more prevalent than other destructive behaviors covered by legislation, such as sexual harassment and racial discrimination.

A Canadian survey on workplace violence found that physical violence is often reported from outside sources, such as customers, students and patients. Psychological violence is more often reported from within the organization. A U.S. study estimates 1 in 5 American workers has experienced destructive bullying in the past year.

## Workplace Policies Needed

On April 6, 1999, a former employee of OC Transpo in Ottawa went on a shooting rampage that left four employees dead, then took his own life. The killer had himself been the victim of workplace harassment.

Among the recommendations of a coroner's inquest was that the definition of workplace violence should include not only physical violence but also psychological violence such as bullying, mobbing, teasing, ridicule or any other act or words that could psychologically hurt or isolate a person in the workplace.

No jurisdiction in Canada requires employers to have a workplace violence prevention program. For that reason, the OC Transpo jury recommended that federal and provincial governments enact legislation to prevent workplace violence and that employers develop policies to address violence and harassment.

## Perpetrators and Targets

Over 80 per cent of bullies are bosses, some are co-workers and a minority bully higher-ups. A bully is equally likely to be a man or a woman.

The common stereotype of a bullied person is someone who is weak, an oddball or a loner. On the contrary, the target chosen by an adult bully will very often be a capable, dedicated staff member, well liked by co-workers. Bullies are most likely to pick on people with an ability to cooperate and a non-confrontative interpersonal style. The bully considers their capability a threat, and determines to cut them down.

## Profile of a Bully

Adult bullies, like their schoolyard counterparts, tend to be insecure people with poor or non-existent social skills and little empathy. They turn this insecurity outwards, finding satisfaction in their ability to attack and diminish the capable people around them.

A workplace bully subjects the target to unjustified criticism and trivial fault-finding. In addition, he or she humiliates the target, especially in front of others, and ignores, overrules, isolates and excludes the target.

If the bully is the target's superior, he or she may: set the target up for failure by setting unrealistic goals or deadlines, or denying necessary information and resources; either overload the target with work or take all work away (sometimes replacing proper work with demeaning jobs); or increase responsibility while removing authority.

Regardless of specific tactics, the intimidation is driven by the bully's need to control others.

### The Burden of Bullying

Bullied employees waste between 10 and 52 per cent of their time at work. Research shows they spend time defending themselves and networking for support, thinking about the situation, being demotivated and stressed, not to mention taking sick leave due to stress-related illnesses.

Bullies poison their working environment with low morale, fear, anger, and depression. The employer pays for this in lost efficiency, absenteeism, high staff turnover, severance packages and law suits. In extreme cases, a violent incident may be the tragic outcome.

The target's family and friends also suffer the results of daily stress and eventual breakdown. Marriages suffer or are destroyed under the pressure of the target's anxiety and anger. Friendships cool because the bullied employee becomes obsessive about the situation.

Moreover, our health care system ends up repairing the damage: visits to the doctor for symptoms of stress, prescriptions for antidepressants, and long term counseling or psychiatric care. In this sense, we all pay.

### Prevention

Workplace bullies create a tremendous liability for the employer by causing stress-related health and safety problems, and driving good employees out of the organization.

The business case for strict anti-bullying policies is compelling. Potential benefits include a more peaceful and productive workplace, with better decision making, less time lost to sick leave or self-defensive paperwork, higher staff retention, and a lower risk of legal action.

Identify bullying in your staff handbook as unacceptable behavior. Establish proper systems for investigating, recording and dealing with conflict. Investigate complaints quickly, while maintaining discretion and confidentiality and protecting the rights of all individuals involved. It is important to understand fully any incidence of bullying and take the problem seriously at all levels.

Organizations who manage people well outperform those who don't by 30 to 40 per cent. Development of strong interpersonal skills at all levels is fundamental to good management and a healthy workplace.

There is no place for bullies in a well-run organization

### RECOMMENDED READING:

Namie & Namie, BULLYING AT WORK (paperback book)

Charlotte Rayner and Helge Hoel, A SUMMARY REVIEW OF LITERATURE RELATING TO WORKPLACE BULLYING, *Journal of Community & Applied Social Psychology,* Vol. 7, 181-191 (1997).

Andrea Adams, BULLYING AT WORK, *Journal of Community & Applied Social Psychology,* Vol. 7, 177-180 (1997)

Charlotte Rayner, THE INCIDENCE OF WORKPLACE BULLYING,, *Journal of Community & Applied Social Psychology,* Vol. 7, 199-208 (1997)

Petter K. Smith, COMMENTARY III: BULLYING IN LIFE-SPAN PERSPECTIVE: WHT CAN STUDIES OF SCHOOL BULLYING AND WORKPLACE BULLYING LEARN FROM EACH OTHER?, *Journal of Community & Applied Social Psychology*, Vol. 7, 249-255 (1997)

Neil Crawford, BULLYING AT WORK: A PSYCHOANALYTIC PERSPECTIVE,Vol. 7, 219-255 (1997)

Jane L. Ireland and John Archer, THE PERCEIVED CONSEQUENCES OF RESPONDING TO BULLYING WITH AGGRESSION: A STUDY OF MALE AND FEMALE ADULT PRISONERS, *Aggressive Behavior*, Wiley-Liss, New York, Vol. 28, 257-272 (2002)

David C. Yamada, THE PHENOMENON OF "WORKPLACE BULLYING" ANDTHE NEED FOR STATUS-BLIND HOSTILE WORK ENVIRONMENT PROTECTION, 88 Georgetown Law Journal 475 (2000)

Dawn Jennifer, Helen Cowie, and Katerina Ananiadou, PERCEPTIONS AND EXPERIENCE OF WORKPLACE BULLYING IN FIVE DIFFERENT WORKING POPULATIONS, *Aggressive Behavior*, Wiley-Liss, New York, Vol. 29, 489-496 (2003)

Ersilia Menesini, Virginia Sanchez, Ada Fonzi, Rosario Ortega, MORAL EMOTIONS AND BULLYING: A CROSS-NATIONAL COMPARISON OF DIFFERENCES BETWEEN BULLIES, VICTIMS AND OUTSIDERS, *Aggressive Behavior*, Wiley-Liss, New York, Vol. 29, 515-530 (2003)

Marilyn Elias, WORKPLACE PROBLEMS INCLUDE BULLYING, *USA Today: Health and Behavior,* September 7, 2004.

Gary Namie, Ph.D, 2003 REPORT ON ABUSIVE WORKPLACES, *The Workplace Bullying & Trauma Institute, October, 2003.*

UNISON, BULLYING AT WORK: GUIDELINES FOR UNISON BRANCHES, STEWARDS AND SAFETY REPRESENTATIVES, London. April 2003.

Trade Union Congress, THE UNION EFFECT, London, 2004

British Medical Journal, WORKPLACE BULLYING: THE SILENT EPIDEMIC, Vol. 326, 776-7; 12 April 2003,

## THE BULLY'S EFFECT ON CULTURE THROUGH POETRY

The Plaintiff prays for the Court's indulgence so that he may present this section of his pleading in the form of poems that he has found in his Internet search and poems that he, himself, wrote to illustrate the frustration felt by a victim of harassment and bullying not only by chief mates and maters but by victims of harassment and bullying by the U.S. Government as evidenced by a current investigation into a certain number of New Orleans police officers who are accused of looting during Hurricane Katrina leaving the Plaintiff to believe that authority should always be questions when the circumstances dictate.

The poem on Supreme Court Justice Ruth Bader Ginsburg on religion is Plaintiff's evidence that he has a sincere belief in religion in order to have written a poem on religion criticizing Justice Ginsburg. The evidence supports plaintiff's allegation of discrimination based of religion in regard to reporting the existence of a child porn photograph on the ship's email computer.

## BULLY AND MATES

Newcastle City Council, Education and Libraries: Children Against Bullying in Schools[4]
[*Plaintiff's version of the title would be: "MASTERS, AND CHIEF MATES, AND BOATSWAINS, OH MY!"*]

He'll squash you like his little pet,
And I'm the bully's mate.
Don't mess with us,
Don't make a fuss,
Cos I'm the bully's mate.
And don't dare tell,
We'll make your life hell,
Cos we're the bully's mates.

---

[4] http://www.newcastle.gov.uk/educlibnew.nsf/a/CABSFeatures?OpenDocument  -  Newcastle City Council, Education and Libraries: Children Against Bullying in Schools

# **Bully in the Alley,** (Canada) [5]

Sea shanties were originally sung by men working on the decks of ships in time to many of their tasks. The earliest chanties were sung by ship captains to keep oarsmen in time with one anothers' strokes. SPECIAL NOTE: According to David HB Drake, the original song wording is *"Bully in the alley"* as opposed to "A bully in the alley" since **"bully"** <u>**actually refers to a staggering drunk sailor asking for help returning to his ship**</u>. "Bully" did not originally refer to an abusive person or threatening individual.

In the late 1800's, Shinbone was a party town for wayfaring seamen. These lyrics may relate to Shinbone, Alabama, but no one seems to know. I found this on an excellent collection of sea songs recorded by Tom Lewis. He can be contacted at: P.O. Box 1095; Salmo, BC V0G 1Z0; Canada.

# **Bully in the Alley,** (United States, Traditional Lyrics)[6]
## Traditional. Arr.: Tom Lewis[7]

Chorus:
Help me Bob I'm bully in the alley.  Way, hey, bully in the alley.
Help me Bob I'm bully in the alley.  Bully down in Shinbone Al.

Sally is a girl that I loved dearly, (Way, hey, bully in the alley)
Sally is a girl that I spliced nearly, (Bully down in Shinbone Al)

For seven long years I courted Sally, (Way, hey, bully in the alley)
All she did was dilly-dally, (Bully down in Shinbone Al)

I left Sal and I went a-sailing. (Way, hey, bully in the alley)
Signed on a big ship, I went a-whaling, (Bully down in Shinbone Al)

If I ever get back to her I'll marry little Sally. (Way, hey, bully in the alley)
Have six kids and live in Shinbone Alley (Bully down in Shinbone Al)

I thought I heard the old man saying, (Way, hey, bully in the alley)
One more chorus then we're belaying, (Bully down in Shinbone Al)

---

[5] www.hunktabunkta.com/800hfbtextras/850chantsxtra/chantsxtra2.html

[6] http://gamgee.acad.emich.edu/~tomlewis/LYRICS/bully_alley.html

[7] http://gamgee.acad.emich.edu/~tomlewis

# Bully in the Alley, (Music Score) [8]



So help me Bob, I'm bul-ly in the al-ley    Way    Ay    bul-ly in the al-ley, So



help me Bob I'm    bul-ly in the al-ley    Bul-ly down in Shin-bone    Al!

# Bully in the Alley, (Lyrics) [9]

**- Melody -**

So, help me Bob, I'm bully in the alley,
*Way, ay, bully in the alley!*
So, help me Bob, I'm bully in the alley,
*Bully down in "Shinbone Al"!*

Sally am de gal down in our alley,
*Way, ay, bully in the alley!*
Sally am de gal, that I spliced nearly,
*Bully down in "Shinbone Al"!*

I'll leave my Sal an' I'll go a-sailin',
*Way, ay, bully in the alley!*
I'll leave my Sal an' I'll go a-sailin',
*Bully down in "Shinbone Al"!*

---

[8] The music score is located at:
http://sniff.numachi.com/~rickheit/dtrad/pages/tiBULLYALL;ttBULLYALL.html
It is also availabl in ABC, SongWright, PostScript, Lilypond, or as a MIDI file. Pennywhistle notation and Dulcimer tab for this song is also available. The MIDI file is located at
http://sniff.numachi.com/~rickheit/dtrad/midi/BULLYALL.midi

[9] http://www.musicanet.org/robokopp/shanty/sohelpme.htm

# The God Complex of Some Chief Mates, (Poem by Plaintiff)

© 2004 Don Hamrick (the Plaintiff)

Sixteen years I've been in the SIU.
Seen some chief mates inflate their egos
'Till they belong in a psych ward's ICU
Relentlessly driven to a god's ethos.

Deceiving masters their true intent
They wreak havoc upon their prey.
Tormenting them without relent.
Complaints disbelieved so victims pray.

Verbal abuse is physical's rival.
Used to harass and to humiliate.
Wounds more damaging to survival.
The chief mate's goal is to spoliate.

Their prey are fired for the slightest,
While chief mates are untouchable for their rank.
Never dare take stand against these tests
The avalanche will bury you in its bank.

Signing aboard you must behave
As though you are a slave.

## AMERICAN MERCHANT SEAMEN IN HARM'S WAY, (Poem by Plaintiff)

By Don Hamrick
© 2004 Don Hamrick

Pirates by sea, terrorists by land.
Through hostile waters we sailors dare steam,
Defensive weapons denied our hand.
Not the law of land or sea it would seem.

Without rhyme or reason,
September 11, a day of slaughter.
Security now a perpetual season.
Arm ourselves now! Sailors oughta!

Pirates and terrorists armed to the teeth,
With every blade and firepower within reach,
Against sailors defenseless as sheep.
For to arm sailors liberals would screech,

Would cause the Bill of Rights
To become our steering light.

# A NIHILISTIC FORM OF GOVERNMENT, THIS UNITED STATES, (Poem by Plaintiff)

By Don Hamrick
© 2004 Don Hamrick

Give us this day our daily servilism,
So that actual freedom may never taunt,
The spirit in us, into a future pugilism.
Lest the government forever haunt.

How long?

Henry Hyde confessed that fateful day,
The Constitution, no longer relevant.
'Tis our fault we are slaves today,
We refused to be freedom's adjuvant.

How long?

Our Republican government, overthrown,
By the Department of Homeland Insecurity.
Terrorism, its propaganda, overblown,
Freedom guaranteed by enslavement to security.

How long?

A new mythos proclaimed from this nihilism,
Only deadens our sense of discernment.
From this ethos of paranoia comes this falabilism,
You can't be trusted.  But trust the government.

How long?

Deceiving us in a blanket of security,
That we are safe from a world of dangers.
Forever oppressed our sense of responsibility,
To protect ourselves from such harbingers.

How long?

In vain we plead our Second Amendment right
To contest government edicts from on high
The courts rule our arguments as so much tripe
They say it does not apply on the thigh

How long?

Three doors of government slammed shut
Leaving us to agitate for want of freedom
The rule of law now is anything but
As we live in this wretched thraldom

How long?

How long will we sit and cower
Resenting those who act above the law
Before we stand up for balance of power
To stop the advancing rape of law

How long?

Lost to us now our Bill of Rights
This Nihilistic government frights.

Will it be much longer?

# JUSTICE RUTH BADER GINSBURG
## HELLING FROM THE TOWER OF BABEL

©2005 Don Hamrick

On April 1, 2005 Justice Ruth Bader Ginsburg gave a speech at the 99th Annual Meeting of The American Society of International Law on VALUE OF A COMPARATIVE PERSPECTIVE IN CONSTITUTIONAL ADJUDICATION.[10]  Her first words cited Deuteronomy 16:20 that is not from the King James Bible.  April 1, 2005 is the same day the U.S. Supreme Court denied Hamrick, (pro se) v. President Bush, et al, No. 04-1150 (DC Circuit, No. 04-5316), a Second Amendment case employing the RICO Act against the United States. My rebuttal follows in the form of a political poem. See also Appendix 16.

Ruth Bader Ginsburg chanting from an uncommon Writ.
*"Justice, justice shall you pursue, that you may thrive!"*
Where, o' where may our justice be found?  Implies the twit,
But in the security of foreign lands to contrive!

O' what Bible does this Supreme Court Justice follow?
Her read is certainly not from the King James!
She will have us *pursue* justice as some elusive swallow
Always beyond our reach, to spite her claims.

We can ignore our Constitution, she implies,
Because it no longer controls our authority.
Comparative analysis, will protect us, she belies
Against all threats in the global fratority.

O' contraire!  We, the People say,
Our Constitution is altogether just!
We shall follow the Constitution for our sake!
We say what it means, as we must!

From Deuteronomy to Genesis, my comparative analysis
The Supreme Court today is our Tower of Babel.
We are held in this awkward state of paralysis,
Because there is no sense to Ginsburg's rabble.

Defiant lines are drawn!  Is civil war sensed?
Our highest court split by globalists' sophistry.
Judicial review in league to conspire against,
Popular constitutionalism finding its place in history.

Oh!  Dear God, I pray to thou!
For answers in these troubled days.
Why hast thou judges forsaken thou?
With no force of arms we are as slaves.

Amen.



---

**THE BASIS FOR THE
CODE OF JUDICIAL CONDUCT**
*"The Canons of Ethics"*

## The King James Bible
Deuteronomy 16:18-20,

18: Judges and officers shalt thou make thee in all thy gates, which the LORD thy God giveth thee, throughout thy tribes; and they shall judge the people *with* just judgment.

19: Thou shalt not wrest judgment; thou shalt not respect persons, neither take a gift; for a gift doth blind the eyes of the wise, and pervert the words of the righteous.

20: That which is altogether just shalt thou follow, that thou mayest live, and inherit the land which the LORD thy God giveth thee.

---

[10] *"A DECENT RESPECT TO THE OPINIONS OF [HUMAN]KIND": THE VALUE OF A COMPARATIVE PERSPECTIVE IN CONSTITUTIONAL ADJUDICATION*, Ruth Bader Ginsburg, Associate Justice- Supreme Court of the United States, April 1, 2005;  http://www.asil.org/events/AM05/ginsburg050401.html

# "CATACLYSMS"

*(A poem in Diamante form)*
© 2005 Don Hamrick

Freedom
Independence, autonomy
Speaking, associating, traveling
Action, responsibility, permission, dependence
Obedience, submission, oppression
Laws, regulations
Slavery

Speech
dialog, lecture
learning, questioning, teaching
research, email, government, investigate
harassing, intimidating, threatening
coercive, abusive
Silence

Association,
Mingle, Join
Participating, discriminating, voting
Society, congress, estrangement, alienation
Disassembling, segregating, dividing
Suppression, stealth
Isolation

Judges
Constitutional, law
Deliberating, theorizing, concluding
Adjudicator, marshal, partisan, crony
Corrupting, lying, betraying
Biased, prejudiced
Criminals

Government
Guidance, balance
Regulating, administrating, delegating
Republic, commonwealth, nihilistic, despotic
Racketeering, marauding, transgressing
Indiscriminate, desultory
Anarchy

# THE ARGUMENT

This civil complaint is necessitated by parallel events, the Plaintiff's athletic condition and the Plaintiff's discovery of a child porn photograph on the ship's email computer for the crew, causing the master to wrongfully and maliciously fire the Plaintiff not for any wrongful act the Plaintiff may have done but for taking action as required by federal law in the child porn photograph situation and being fired for such action on grounds of the other situation, the latter was used to cover up the former to avoid a Coast Guard investigation, that is if the evidence was deleted from the computer in order to subvert Plaintiff's allegation of child porn on that computer.

The master has an apparently excessive adherence to the hierarchical chain of command structure noted for merchant ships at sea. While this has been the tradition it is often times abused. Rather that taking the time to find out why the Plaintiff was "sitting on a stool" the master elected to remain aloof and unapproachable. The master relied on his own prejudiced eyes and determined a preconceived judgement the an AB on watch has no good reason to be sitting on a stool on the bridge.

To the master's rude awakening the Plaintiff alleges that not only the right of dignity owing to basic human rights but also the *Special Circumstances* clause of Rule 2 of the International Rules of Navigation covers the athletic condition of an AB on watch that requires exercising soar and aching muscles not used when the Plaintiff had been ashore for a couple of months and not employed prior to joining the vessel. It is a natural state of the human condition that muscles will ache when placed back in a working environment. The third mate and the master misconstrued this natural human condition as a medical condition in belligerence ignorance to what the Plaintiff was trying to tell the third mate and the master. They arrogantly believed what the wanted to believe and no amount of the truth from the Plaintiff would move them from their prejudice.

### THE DISCHARGE LETTER ANNOTATED

The Plaintiff begins by rebutting the Master's Discharge Letter from Appendix 2, point by point, disputing the Master's version with the truth. The Plaintiff cites the very first paragraph of the Discharge Letter to introduce Plaintiff's actual physical condition having a direct bearing on why he was sitting on a stool on the first day on the job:

DISCHARGE LETTER    "Mr. Donald Hamrick reported aboard the Vessel in Souda Bay Crete on 13 September 2005. On 14 September 2005 during Mr. Hamrick's 1200 to 1600 watch the Master observed Mr. Hamrick sitting down on watch. The Master advised the third officer John Duhrkoff that we are not going to start a precedence of having the watchstanders sitting down on watch."

PLAINTIFF'S REBUTTAL    ". . . I reported aboard USNS FISHER on September 12, 2005 in Souda Bay,

28

Excerpted From
Appendix 1.

Crete. Because I had been ashore for a couple of months in front of my laptop day in and day out pushing federal civil cases for the Second Amendment and other cases of seaman's rights to work aboard ship free of harassment and bullying I had become, in the sense of athletic condition, soft to the extent that even walking a half-mile working my hip muscles into a state of soreness. Getting back to work became necessary for not only my economic condition but for my athletic condition.

In the first few days aboard ship standing was in itself an exercise and standing my watches became my exercise, conditioning my lower back muscles were rewarded with minor aches and pains. As they say in all exercise rooms, "No pain? No gain!" However, my aches and pains were misconstrued as a medical condition of the lower back vertebrae and the spine. I was nearly discharged on a mutual consent condition based on this false presumption."

DISCHARGE LETTER

At the completion of his watch the third mate informed the Master that Hamrick had a medical condition, "curvature of the spine", that made him unable to stand for prolonged periods of time.

PLAINTIFF'S REBUTTAL

When the Plaintiff reported aboard he was advised his AB watch partner to watch what he says when he talks to others on the ship. What is said often times will come back on him in detrimental ways. When the Plaintiff explain the aches and pains to the third mate, the mate on watch, as a condition resulting from sitting at a laptop 16 hours a day for a couple of months, that the body goes soft, and that the aches and pains were just the normal reaction to recondition the muscles for going back to work aboard ship. When the third mate persisted in questioning the Plaintiff in what the Plaintiff perceived was just idle social conversation the Plaintiff jokingly remarked that he has a slightly curved back (as all backbones have a slight "S" curve. True to form from that advisory warning from the AB watch partner that remark would be used against the plaintiff as part cause for his firing. The Plaintiff apparently broke the taboo of speaking freely as a new crew member rather than to stay quiet until all had gotten to know the Plaintiff better. This has First Amendment implications: free speech, and assembly.

DISCHARGE LETTER

The Master being informed of this condition summoned Mr. Hamrick to his office in the presence of the chief officer and the third officer to inquire of his medical condition. Previous to this the Master contacted AMSEA marine personnel office for guidance. Marine personnel gave the Master the option that if Mr. Hamrick's medical condition rendered him incapable of performing his duties AMSEA would send Mr. Hamrick home mutual consent and pay his transportation expenses.

PLAINTIFF'S REBUTTAL

The master acted on "rumor only" when he contacted AMSEA marine personnel office for guidance. The third mate did not state the actual facts to the master. The third mate embellished the true by expanding on the Plaintiff's "curved back" remark, even though the Plaintiff's explicitly stated prior to that remark that his was an athletic condition and not a medical condtion. The Plaintiff refused the mutual consent offer because he would be committing fraud against the company by accepting services that cost money for the company under false conditions. The Marine Index Bureau (MIB) has been the

first line of defense against fraud in maritime injury claims. The MIB database is the most complete source of information on personal injury claims by maritime employees and third parties in the U.S. marine industry. The Master was setting the Plaintiff up to commit fraud because of his own propensity to believe the worst and a faulty reliance on the traditions of the maritime industry. The Master was unwittingly encouraging the Plaintiff to commit fraud.

DISCHARGE LETTER    After being informed of this Mr. Hamrick informed the Master that he was capable of standing his watch and he did not have curvature of the spine just quote "a big beer belly" end quote.

PLAINTIFF'S REBUTTAL    The Plaintiff viewed this meeting as a maddening lynch mob who had enflamed their own passions based on embellishing the truth and a rumor mill working overtime. To quell this administrative riot the Plaintiff resorted to self-ridicule to stress the point on how ridiculous this meeting was referring to his abdominal shape as "a big beer belly" to lighten the angered mood. This strategy did not work. It was used detrimentally against him in the discharge letter. The Master using the quote, "a big beer belly," indicated an implied belief that the Plaintiff drank beer to achieve that shape. This is absolutely not true. True is derived from a combination of a lack of exercise and excessive consumption of soft drinks (i.e. Pepsi, Dr. Pepper, Mountain Dew, etc.).

DISCHARGE LETTER    Seeing that Mr. Hamrick was attesting that he would stand his watch and perform the duties required of him as an able seaman aboard the vessel the Master deem in Mr. Hamrick's favor.

PLAINTIFF'S REBUTTAL    Apparently, the Master began to see the lunacy of the meeting that he, himself, called to order.

DISCHARGE LETTER    Thursday 22 September 2005, while on your 1200 to 1600 watch you approached the third officer John Duhrkoff and requested to leave the bridge to go to the ship's store, "slop chest". The third officer informed you, you could not go. After returning out of the chart room the third officer noticed you missing. You soon returned to the bridge with snack food. When the third officer asked where you had been you reported the slop chest.

PLAINTIFF'S REBUTTAL    The allegation that the Plaintiff left the bridge, in and of itself is true. However, there are mitigating circumstances that the mate took into account and determined that notifying the master at that time was not appropriate. The mitigating circumstances were (1) the third mate did, in fact, allow the Plaintiff to go to the slop chest on a couple of occasions prior to this event; and (2) the two-way radios on the bridge were blaring with ship-to-ship communications making it difficult to hear the third mate. The Plaintiff presumed he heard the third mate say "yes," that he could go to the slop chest. The Plaintiff walk right past the third mate, behind him, saying he would be right back as he left the bridge. The Plaintiff asserts that he left the bridge with the mate present on the bridge. The third mate's statement that he was in the chart room when the Plaintiff left is not true. This is the most seriously of all the allegations. The pivotal point on who to believe rests on where the third mate actually was when the Plaintiff left the bridge. The Plaintiff asserts that he did not and would



never leave the bridge out of his own professional sense of responsibility. The Plaintiff is too intelligent to take such a risk where anyone could question his presence below decks and discover his transgression if he were to leave the bridge without permission. The risk is far too great and the act far too stupid for the Plaintiff to even consider.

DISCHARGE LETTER    You as a[n] able seaman should know the importance of maintaining a vigilant lookout and being available for the helm.

PLAINTIFF'S REBUTTAL    This remark by the master is the crux of an on-going problem with union contracts. Crew reduction based on cost savings at the expense of safety of the ship and to navigation. Many companies reduce their ship's manning levels from two ABs on watch to one AB on watch. For those ships that still maintain two ABs on watch the majority of them, if not all of them, require one AB to work out on deck with the Boatswain during their day watch (8-12 watch, and 12-4 watch) in the vicinity of the bridge. A few vessels, like the USNS FISHER, requires the AB to work all over the ship and in the holds. *See Lookout Defined by Case Law* on page 6 for more information.

DISCHARGE LETTER    This situation of your disobedience of staying on the bridge for your watch was jut brought to my attention today.

PLAINTIFF'S REBUTTAL    What disobedience? Here, the third mate belatedly informs the master of the Plaintiff leaving the bridge while on watch but apparently neglects to inform the master that the third mate has allowed the Plaintiff to leave the bridge while on watch on prior occasions. If the Plaintiff's offense wasn't serious enough to inform the master at the time of the incident then why tell him at the Discharge for Cause meeting. Isn't the third mate vulnerable a dereliction of duties charge by the master? If the Plaintiff leaving the bridge was clearly the Plaintiff's fault then why did the third mate *NOT* inform the master at the time of the incident? Could it be that the third mate *KNEW* that Plaintiff rebuttal was that the third mate did not speak loud enough to be heard over the marine radios? That the third mate knew he was partly to blame for not making sure the Plaintiff heard him? Why didn't the master use logic to take this fact into consideration as mitigating circumstances demanding leniency? Could it be that the master felt threatened by the Plaintiff's obedience to God in regard to child porn on the computer and obedience to federal law governing the same subject? Why didn't the must want to listen to reason?

DISCHARGE LETTER    For the above said dereliction of your duties you are here by discharged from any further and all duties aboard my vessel.

PLAINTIFF'S REBUTTAL    From the above explained circumstances the master did not have a clear cause to discharge the Plaintiff for cause. The master abused and violated a gambit of Plaintiff's rights.

DISCHARGE LETTER    You are reprimanded to your quarters and will stay there with the exception of meal hours where you will travel between the messroom and your room on the 02 level utilizing only the elevator until your departure tomorrow 24 September 2005.

PLAINTIFF'S REBUTTAL    The master failed to discuss in the Discharge Letter that he ordered the U.S. Navy security detachment to post a continuous military guard outside the Plaintiff's quarters and to escort the Plaintiff for the meal hour. Was the master concerned that the Plaintiff may uncover other evidence of crimes?

DISCHARGE LETTER    Any disobedience in this order will be reflected in the official log book and reported to the USCG Marine Safety Office.
(signature)

Robert C. Wattam / Master
USNS FISHER
c/c AB Hamrick, Bosun Daranda, CM Clements, 3M Duhrkoff, AMSEA, Official Log

The Plaintiff was told of the working conditions aboard the USNS FISHER by his AB watch partner that when the Deck Department (Boatswain and Dayworking Abs/OSs) are working in the holds and the atmosphere in the holds are stuffy and humid such that the human body sweats profusely the ventilation system remains off. But when the engineers work in the holds they turn the ventilation system on for their comfort. On a day when the Plaintiff was on watch and it was his turn to work on deck he was assigned work in one of the lower holds on B Deck. When the Plaintiff was sweating profusely and he saw another member of the Deck Department without a shirt and also sweating profusely the Plaintiff called the third mate on the bridge and requested the ventilation to be turned on in that part of the lower hold. The Plaintiff made no other comment except that the working condition in the hold is causing the Plaintiff to sweat profusely. The Plaintiff said nothing else about his condition.

The Boatswain arrived in the hold and advised the Plaintiff that the report over the radio from the third mate on the bridge said that the Plaintiff was "feeling dizzy." The third mate, whatever his reasons were, falsely reported the Plaintiff's request to the Boatswain. Because of that false report the Boatswain reassigned the Plaintiff to do a saltwater wash down of the stern ramp with a fire hose. This job reassignment by the Boastwain was based on false information reported to him by the third mate and as such is an incident of discrimination. It is evidence that the third mate has a propensity to relay information that was not reported to him. In other words, the third mate has a propensity to embellish a story.

This embellishment is evidence that the third mate has a double standard of concealing information from the master that reflect poorly on the third mate, like not speaking up loud enough to be clearly heard by the Plaintiff when the Plaintiff requested to visit the Slop Chest but later inform the master of that event when the master needed something on the Plaintiff to fire him over his reporting of child porn to the U.S. Coast Guard. This "betrayal" of confidence from the third mate completes the

offenses of Breach of Contract with AMSEA not to discriminate against the unlicensed members of the SIU, and *Conspiracy Against Rights*, 18 U.S.C. § 241 and *Deprivation of Rights Under Color of Law*, 18 U.S.C. § 242.

## POSSIBLE CRIMES COMMITTED BY THE MASTER

The Plaintiff believes and alleges that it is quite conceivable that the master committed the following crimes in his process of offering the mutual consent discharge and the subsequent firing:

> 18 U.S.C. § 241 Conspiracy Against Rights
> 18 U.S.C. § 242 Deprivation of Rights Under Color of Law
> 18 U.S.C. § 245(b)(1)(C) Federally Protected Activities
> 18 U.S.C. § 371 Conspiracy to Commit Offense or to Defraud the United States
> 18 U.S.C. § 1001 Fraud and False Statements: Statements or Entries Generally
> 18 U.S.C. § 1035 False Statements Relating to Health Care Matters
> 18 U.S.C. § 2252 Certain Activities Relating to Material Involving the Sexual Exploitation of Minors
> 18 U.S.C. § 2252A Certain Activities Relating to Material Constituting or Containing Child Pornography

## MISPRISION OF FELONY 18 U.S.C. § 4

**Plaintiff's Commentary:** The pivotal allegation is whether the 5-year existence of adult or child pornography on a U.S. Government computer used for crew email constitutes circumstantial or direct evidence of a prima facie case of misprision of felony.

**Case Law:** A "misprision of felony" is the concealment of a felony without giving any degree of maintenance to the felon. *United States v. Perlstein*, C.C.A.3 (N.J.) 1942, 126 F.2D 789, certiorari denied 62 S.Ct. 1106, 316 U.S. 678, 86 L.Ed. 1752. Elements of the crime of "misprision of felony" are that the principal committed and completed the felony alleged, that the defendant had full knowledge of tht fact, that the defendant failed to notify the authorities, ad that defendant took an affirmative step to conceal the crime. *United States v. Ciambrone*, C.A.9 (Nev.) 1984, 750 .2d 1416. Crime of misprision of felony has four elements: commission of felony alleged; accused had full knowledge of that fact; accused failed to notify authorities; and accused took affirmative step to conceal crime. *United States v. Baez*, C.A.10 (Okla) 1984, 732 F.2d 780. An essentiall element of the offense of misprision offelony is concealment, and mere failure to report a felony is not sufficient to constitute a violation under this section. *United States v. Johnson*, C.A.5 (Tex) 1977, 546 F.2d 1225.

**Case Law:** Statute making it a crime for a person having knowledge of the actual commission of a felony cognizable by court of the United States to conceal and not make known the crime defines a criminal offense and does not provide civil complainants with a private cause of action, and plaintiff cannot invoke that statute as jurisdictional basis for complaint. *Pankey v. Webster*, W.D.Mo. 1993, 816 F.Supp. 553.

# AMERICAN JURISPRUDENCE 2d ON VARIOUS SUBJECTS

**PREVENTION OF PERFORMANCE AS BREACH** (17A Jur 2d § 717 - Footnotes omtted)

It is a necessary implication of every contract with promises or covenants binding each party that neither will interfere to prevent performance by tyhe other, and a contracting party whose performance of his promise is prevented by the adverse party is not obligated to perform. His nonperformance is not a breach and does not render him liable to pay damages. Moreover, such prevention is a breach of the contract by the party so preventing performance and renders him liable to pay damages for the breach. Where performance is a condition, but has been prevented, an action for damages may be maintained without performance or tender by the plaintiff, the performance of the condition requiring such performance or tender being excused. And where performance is prevented, failure to perform in full is excused and an action may be maintained upon the contract although there has been only part performance.

If the nonexistence either of something which is a substantial subject matter of the contract or of some condition or particular state of things which is of the substance of the contract I attributable to some breach of contract or of a duty on the part of one party and prevents the other party from performing his contract, such othr party has a right of action on the contract notwithstanding such nonperformance. The party prevented from performing is at liberty to treat the contract as broken and abandon it and recover damages for the breach. In other words, such party may regard it as terminated and demand whatever damage he has sustained thereby.

**RETALIATION PROHIBITED BY TITLE VII OF THE CIVIL RIGHTS ACT OF 1964** (42 U.S.C. § 2000e-3(a)) (45A Am Jur 2d § 215 - Footnotes omitted)

> **42 U.S.C. § 2000e-3(a) Discrimination for Making Charges, Testifying, Assisting, or Participating in Enforcement Proceedings:** It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

**Case Law:** In order to establish a prima facie claim of Title VII retaliation, an employee must show: (1) that the employee engaged in activity protected by Title VI; (2) that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse action. *Ackel v. National Communications, Inc., Inc.*, C.A.5 (La) 2003, 339 F.3d 376, rehearing and rehearing in banc denied 84 Fed.Appx. 472, 2003 WL 22345107.

> **46 U.S.C. § 2114: Protection of Seamen Against Discrimination**

(a) An owner, charterer, managing operator, agent, master, or individual in charge of a vessel may not discharge or in any manner discriminate against a seaman because the seaman in good faith has reported or is about to report to the Coast Guard that the seaman believes that a violation of this subtitle, or a regulation issued under this subtitle, has occurred.

(b) A seaman discharged or otherwise discriminated against in violation of this section may bring an action in an appropriate district court of the United States. In that action, the court may order any appropriate relief, including:

(1) restraining violations of this section; and

(2) reinstatement to the seaman's former position with back pay.

Retaliation against persons who oppose discrimination prohibited by Title VII of the Civil rights Act of 1964 is prohibited; tus, it is an unlawful employment practice for an employer to discriminate against any employee . . ., because such person has opposed any practice made an unlawful employmet practice by Title VII of the Civl Rights Act of 1964, or because such person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing related to the enforcement of such rights. That is, Title VII protects persons not just from certain forms of job discrimination, but also from retaliation for complaining about the types of discrimination it prohibits. Thus, Title VII prohibits an employer from retaliating against an employee who is engaged in a protected activity, which can be either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII.

What is necessary in all Title VII retaliation cases is evidence that the challenged discriminatory acts or harassment adversely effected th terms, conditions, or benefits of the plaintiff's employment. An employee may prevail on a Title VII retaliation claim if the employee can sow that he or she opposed an unlawful employment practice under Title VII, that he or she was the object of an adverse employment action, and that the adverse action was caused by his or her opposition to the unlawful employment practice.

An employee my demonstrate that an employer's attempt to offer a legitimate explanation for the allegedly retaliatory acts constituted a pretext.

Title VII does not require that a plaintiff who asserts a retaliation claim prove that the conduct opposed was actually in violation of Title VII, but only that a charge was made, or that participation in an investigation of a violation of Title VII occurred.

**PRELIMINARY INJUNCTIVE RELIEF** (45C Am Jur 2d § 2569 - Footnotes omitted)

The party seeking a preliminary injunction usually must show that:

- he or she is likely to succeed in proving the merits of the claim.

- he or she would suffer irreparable injury if the injunction were denied.
- the issuance of the injunction would not unduly harm other persons.
- the issuance of the injunction would serve the public interest.

The most important factor for a district court to consider when deciding whether to exercise its discretion to award injunctive relief under Title VII of the Civil Rights Act of 1964 is whether the facts indicate a danger of future violations of Title VII.

**EVIDENCE - HABIT OR ROUTINE PRACTICE (RULE 406)** (29 Am Jur 2d § 390 - Footnotes omitted)

[Rule 406 of the Federal Rules of Evidence] specifically rejects any requirements of corroboration or eyewitnesses as conditions precedent to admissibility. Such factors are deemed to relate to sufficiency of the evidence rather that to admissibility. In states adopting the Rule, the phrase "whether corroborated or not" has been said to eliminate the common-law requirement that there be evidence that the person acted in conformity with the habit or routine practice on the particular occasion in suit. In a jurisdiction which has not adopted Rules of Evidence, it has been similarly held that because one who has demonstrated a consistent response under given circumstances is more likely to repeat that response when the circumstances arise again, evidence of habit is admissible to prove conformity on specified occasions.

**ELEMENTS OF HABIT** (29 Am Jur 2d § 393)

In the context of Rule 406, habit may be said to consist of three elements: (1) regularity, (2) specificity, and (3) an involuntary or semiautomatic response.

In regard to th first element, habit has been defined as one's regular response to a repeated situation. Regularity has two sub-elements: frequency and consistency. Conduct is not a habit or routine practice unless it is frequently engaged in. In regard to the consistency requirement, it has been held that conduct is not a habit unless it is a person's invariable or at last frequent response to a particular situation; a standard not met, for example, by the person's engaging in the "habitual" conduct only about half the time. To support a finding of admissibility as habit uner FRE Rule 406, it is necessary to critically examine the ratio of reactions to the situations and to show regularity ofconduct by comparing the number of instances in which any such conduct occurs with the number in which no such cnduct takes place.

The second element, specificity, is the quality that distinguishes admissible evidence of habit or routine practice from inadmissible character evidence, which is a genralized description of one's

36

disposition. The third element is that the conduct be an involuntary or semiaumatic response to a specific situation.

**ROUTINE PRACTICE OF ORGANIZATION** (29 Am Jur 2d §394)

Routine practice of an organization is behavior on the part of a group which is equivalent to habit of a person; that is, an organization's practice of handling a particular kind of situation with a specific type of conduct. This concept contemplates a certain threshold ratio of the proved instances to the total conduct claimed to be habitual orroutine. That ratio in turn depends on the nature of the routine practice at issue. Thus an organizaton's regularity of action is within the purview of the Rule.

Organizational routine also describes something often repeated, which tends to be semiautomatic in the sense that it tends to be ministerial and iscarried on from day-to-day without the need for managerial decisions. Although many instances of organizational routine deal with business customs, FRE Rule 406 does not require a business setting and the routine of charitable, religious, educational, governmental, or even politicial organizations is clearly within the literal terms of the rule.

**INDUSTRY CUSTOMS AND STANDARDS** (29 Am Jur 2d § 395)

In negligence case, evidence of industry custom or standard, that is, evidence or "routine practice" in the industry, is received as a kind of circumstantial proof to show that the conduct in the litigated case conformed, or did not conform, to what others do in similar situations. While such proof is not affected by Rule 406, it is closely related thereto.

It has been said that what is ordinarily and usually done by those who are engaged in the same business, occupation, or undertaking, has some relevancy to the inquiry as to what an ordinarily prudent person would do under the same circumstances. Thus, it is generally held that in cases where the method used which resulted in an injury is not clearly and inherently negligent or dangerous, evidence is admissible of the general custom of others engaged in the same kind of business, occupation, or undertaking, asto the particular method under investigation, for the consideration of the jury for whatever light it might throw upon the question whether the method used was or was not negligent under the circumstances of the particular case before the cout, frequently been admitted as evidence of industry standards. Conformity withy custom is some proof of due care, and nonconformity of some proof of negligence, and it is not essential t the admissibility of such evidence that a contractual relationship exist between the parties to the action.

Nor is it essential to the admissibility of evidence of general practice or usage to show that it constituted a "custom" in the legal technical sense, for the purpose of lsuch evidence is simply to show the ordinary practice. Thus, it is not necessary to prove that the practice or usage was universal, or that

it had been in existence for the length of time peculiar to a common-law custom. However, evidence of the general custom of one company or a single individual or small group with respect to the act in question is usually held inadmissible because such custom may not conform to the usual customary rule in the industry.

## CASE LAW ON FREE EXERCISE OF RELIGION

"Exercise of religion," under Religious Freedom Restoration Act, means exercise of religion under First Amendment which only protects sincerely held beliefs that are rooted in religion. *United States* v. *DeWitt*, C.A.8 (Mo.) 1996, 95 F.3d 1374.

# WHAT THE BIBLE SAYS ABOUT PORNOGRAPHY

JOB'S COVENENT

Although the Bible does not directly address the subject of pornography, it is clear about the subjects of lust and sexual immorality. Job 31:1 says, "I made a covenant with my eyes not to look lustfully at a girl." Pornography not only breeds lustful looks but thrives upon them. One cannot do as Job teaches and watch pornography.

EQUIVALANT OF ADULTERY

In Matthew 5: 27-29, Jesus says this about lust, "You have heard that it was said, 'Do not commit adultery.' But I tell you that anyone who looks at a women lustfully has already committed adultery with her in his heart. If your right eye causes you to sin, gouge it out and throw it away. It is better for you to lose one part of you body than for your whole body to be thrown into hell." Many men may use pornography who would never dream of committing adultery; but, from the Lord's viewpoint, they are committing adultery.

David's Lust

II Samuel 11 tells of King David's difficulties with lust. He was walking around the roof of the palace, not looking for trouble, when he came upon Bathsheba taking a bath. His lust lead him to commit adultery with her and to murder her husband. David's "innocent" sin of lust led him to commit greater sins that brought him to the worst parts of his life. You can see the anguish these sins brought as he writes Psalms 51. When David came across Bathsheba, he was not seeking the temptation; yet, it caused so many problems. Do you not think that even greater problems will arise in our lives if we seek the temptations of pornography?

PUT TO DEATH YOUR LUST

The Bible instructs us how to avoid the temptation of lust in our lives. Colossians 3:5 says, "Put to death, therefore, whatever belongs to your earthly nature: sexual immorality, impurity, lust, evil desires and greed, which is idolatry." The Bible directs us to take a proactive role in preventing our lusts when it instructs us to "put (the lust) to death." To do this, we must remove the temptations from our lives. To follow this direction, we must get pornography not only out of our homes, but out of our community as well.

| PORNOGRAPHY'S SUBJECTS CONDEMNED | Many of the images portrayed in hard-core pornography are discussed in Leviticus 18. We are commanded not to engage in sexual perversions such as incest, homosexuality, and bestiality. These are often the subjects of hard-core pornography. In Leviticus 18:29, the Lord commands, "Everyone who does any of these detestable things - such persons must be cut off from their people." To allow this type of pornography to exist is to disobey the commandment of the Lord. |
|---|---|
| CONCERN FOR OTHERS | God's people have the responsibility to not only purify their own lives from the sin of pornography, but to protect others from the problems that it causes. God says that the second greatest commandment, next to loving Him, is to "Love your neighbor as yourself." (Mark 12:31) How can we love our neighbor and allow pornography to destroy their lives? We cannot; we must not. |
| | No one is immune to the evils of pornography. Innocent children suffer from the affects of child pornography and molestation. Read what Jesus says about the children in Matthew 18:6-7, "But if anyone causes one of these little ones who believe in me to sin, it would be better for him to have a large millstone hung around his neck and to be drowned in the depths of the sea. Woe to the world because of the things that cause people to sin! Such things must come, but woe to the man through whom they come!" |

Written by Arkansas Faith and Ethics Council.
Permission is given to reproduce and distribute this material.
Revised: September 14, 2001 by Ken Fithen.

---

**STATING THE OBVIOUS: PROTECTING RELIGION FOR RELIGION'S SAKE**, 47 Drake Law Review 45 (1998)

Citing from Gregory C. Sisk,[*] *STATING THE OBVIOUS: PROTECTING RELIGION FOR RELIGION'S SAKE*, 47 Drake Law Review 45 (1998) (Constitutional Law Symposium on The Role of Freedoms)

I. THE INSIGHT: CONSTITUTIONAL RIGHTS MUST BE UNDERSTOOD IN LIGHT OF THEIR PURPOSE

Sometimes, in legal theory as well as in life, an insight is expressed that in retrospect seems so obvious that it is remarkable that no one had said it before or at least said it

---

[*] Professor Sisk joined the University of St. Thomas law faculty in 2003, after teaching for twelve years at the Drake University Law School, where he had also been named as the Richard M. & Anita Calkins Distinguished Professor. He has taught Professor Responsibility and Civil Procedure, and developed new courses with original materials on Litigation with the Federal Government and on Law and Religion. His casebook, "Litigation With the Federal Government," was published by Foundation Press in 2000 and has been adopted at several law schools, including Georgetown University, George Washington University, Catholic University, New York University, the University of Pittsburgh, and McGeorge School of Law. He has published more than a dozen articles on litigation with the federal government, judicial decisionmaking, awards of attorney's fees, professional responsibility, constitutional interpretation, and tort reform. His articles have been cited by the United States Supreme Court, several federal courts of appeals, and the supreme courts of several states. His empirical study of judicial decisionmaking and the influence of judicial background, co-authored with Professors Michael Heise and Andrew Morriss, was published in the New York University Law Review and received the 1999 Article Prize from the Law and Society Association.

so plainly. Such is the case with John Garvey's observation that our identification, interpretation, and application of constitutional rights should include an understanding of the purpose of those rights, hence the title of his book, What Are Freedoms For? [1] Freedoms exist not merely for the neutral purpose of promoting individual autonomy in its most isolated sense but rather to protect certain higher values or goods that we as a society have selected as especially worthy.[2]

Illuminated by that bright light, the clouds of confusion surrounding the meaning of the Free Exercise Clause of the First Amendment[3] begin to lift. However archaic it may seem to the modern sophisticated mind, the manifest purpose of the clause is straightforward — to recognize and protect the positive good of religious faith and practice. By singling it out for protection in the Con- [Page 46] stitution, the Founders identified religion as something uniquely valuable and worthy of encouragement.

---

[1] JOHN H. GARVEY, WHAT ARE FREEDOMS FOR? (1996).

[2] Id. at 19 ("[F]reedoms allow us to engage in certain kinds of actions that are particularly valuable. The law leaves us free to do x because it is a good thing to do x.").

[3] U.S. CONST. amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion] . . .").

Justice Scalia's opinions in both *Smith* and *City of Boerne* neglected to consider the religiously devout environment of the founding era,[80] although such an immersion in the historical context is essential to the originalist interpretive enterprise.

To the ears of a nation founded on violent rebellion against a regime accused of infringing God-given natural rights — a nation that still revered the independent freeholder armed against tyranny — the suggestion that civil government could trespass upon the walk of the faithful in the ways of the Lord would have sounded hollow and peculiar. For a people that believed in "the [Page 62] absolute sovereignty of God,"[81] the hierarchy of duties — God and country, in that order — was manifest and acknowledged.[82] As James Madison, the primary drafter of the First Amendment, said in his famous *Memorial and Remonstrance Against Religious Assessments*, the religious duty of conscience to the Creator is — precedent, both in order of time and degree of obligation, to the claims of Civil Society. Before any man can be considered a member of Civil Society, he must be considered as a subject of the Governor of the Universe.

---

[80] Interestingly, Justice Scalia has recognized — and heavily relied upon — the pervasively religious climate of the founding period in the context of interpreting the Establishment Clause, finding the historical practice justifies greater accommodation of religion by government. In *Lee v. Weisman*, Justice Scalia dissented from an opinion holding that a school could not appoint a clergyman to deliver a nonsectarian prayer at a high school graduation. *Lee v. Weisman*, 505 U.S. 577, 631-46 (1992) (Scalia, J., dissenting). In the course of his dissent, Justice Scalia wrote:

> From our Nation's origin, prayer has been a prominent part of governmental ceremonies and proclamations. The Declaration of Independence, the document marking our birth as a separate people, "appeal[ed] to the Supreme Judge of the world for the rectitude of our intentions" and avowed "a firm reliance on the protection of divine Providence." In his first inaugural address, after swearing his oath of office on a Bible, George Washington deliberately made a prayer a part of his first official act as President.

Id. at 633. Near the end of that opinion, Justice Scalia appealed to the religious devotion of the American people and their leaders from the founding to the present day:

> Church and state would not be such a difficult subject if religion were, as the Court apparently thinks it to be, some purely personal avocation that can be indulged entirely in secret, like pornography, in the privacy of one's room. For most believers it is not that, and has never been. Religious men and women of almost all denominations have felt it necessary to acknowledge and beseech the blessing of God as a people, and not just as individuals, because they believe in the "protection of divine Providence," as the Declaration of Independence put it, not just for individuals but for societies; because they believe God to be, as Washington's first Thanksgiving Proclamation put it, the "Great Lord and Ruler of Nations."

Id. at 645. One wishes that Justice Scalia would listen to the Free Exercise Clause with ears similarly attuned to the worshipful music that reverberated around the framing and ratification of the First Amendment. If God does exist and makes claims upon His people-or at least if the founding generation so believed-then does that not inform our understanding of the purpose for which a constitutional protection of religious exercise was designed?

[81] See ELLIS SANDOZ, A GOVERNMENT OF LAWS: PLITICAL THEORY, RELIGION, AND THE AMERICAN FOUNDING 147-49 (1990) at 157 (referring to the powerful concept of "the absolute sovereignty of God" for the Americans of the founding period).

[82] See Acts 5:29 (King James) ("Then Peter and the other apostles answered [the council leaders] and said, We ought to obey God rather than men."). The "ubiquity of the Bible in early America" and the persistence of Bible reading throughout the formative period, SANDOZ, supra note [81], at 129, ensured that this and other scriptural passages were universally familiar among Americans.

And if a member of Civil Society, who enters into any subordinate association, must always do it with a reservation of his duty to the General Authority, much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign.[83]

Religious exercise was specifically protected in the constitutional text precisely and logically because the exercise of religion was regarded as valuable, indeed the shared need and desire of a faithful people, and was understood to be true and right.[84]

## V. CONCLUSION — THE FOUNDING AND CONTEMPORARY GENERATIONS

In the end, there may be little or no disconnection and distance between the people of the founding era and our generation on this question. Taking religion seriously, valuing religious faith as a good in itself and not merely as a manifestation of individual autonomy, and elevating the religious claim of conscience above arguments from secular humanist philosophy may mystify or even offend the elite who dominate our cultural and educational institutions. But the religious justification still resonates with many, if not most, Americans. A poll of the citizens of the state in which this symposium is being held, just two weeks [Page 63] before, found that nearly nine out of ten pray and believe in answers to prayer.[85] Stephen Carter has noted the same phenomenon at the national level, as nine out of ten Americans believe in God and four out of five pray regularly, although the political and social culture may denigrate the sincere believer and trivialize religion.[86]

In explaining the purpose of the Free Exercise Clause, and comparing the generations of the founding and the present day, Michael McConnell aptly concludes:

To deny that the government has an obligation to defer, where possible, to the dictates of religious conscience is to deny that there could be anything like "God" that could have a superior claim on the allegiance of the citizens — to assert that government is, in principle, the ultimate authority. Those are propositions that few Americans, today or in 1789, could accept.[87][87]

In any event, whatever may be the mood of these present times, the pro-religion purpose underlying the Free Exercise Clause and enshrined in its text must be

---

[83] JAMES MADISON, Memorial and Remonstrance Against Religious Assessments (1785), in 1 AMERICAN POLITICAL WRITING DURING THE FOUNDING ERA 1760-1805, at 631, 632 (Charles S. Hyneman & Donald S. Lutz eds., 1983).

[84] See JOHN H. GARVEY, WHAT ARE FREEDOMS FOR? (1996) at 49 ("The best reasons for protecting religious freedom rest on the assumption that religion is a good thing. Our Constitution guarantees religious freedom because religious people want to practice their faith.").

[85] Thomas A. Fogarty & Tracy Deutmeyer, Poll Finds Iowans Pray Religiously, DES MOINES REGISTER, Apr. 10, 1998, at 1M, 2M.

[86] STEPHEN L. CARTER, THE CULTURE OF DISBELIEF 4 (1993).

[87] Michael W. McConnell, Free Exercise Revisionism and the Smith Decision, 57 U. CHI. L. REV. 1109, 1115-16 (1990) at 1152. Indeed, as Dan Conkle has noted, the passage of RFRA, notwithstanding its subsequent invalidation by the Supreme Court, "demonstrates that contemporary American values support the protection of religiously motivated conduct even from laws of general application." Daniel O. Conkle, The Religious Freedom Restoration Act: The Constitutional Significance of an Unconstitutional Statute, 56 MONT. L. REV. 39, 91 (1995).

acknowledged and given effect. Fidelity to the Constitution means that, when it comes to upholding and implementing the religious justification underlying the Free Exercise Clause, failure is not an option.

U.S. CODE

TITLE 46, APPENDIX - **SHIPPING**

CHAPTER 27 - **MERCHANT MARINE ACT, 1936**

SUBCHAPTER XIII - **Maritime Education and Training**

**46 USC § 1295. Congressional declaration of policy**

It is the policy of the United States that merchant marine vessels of the United States should be operated by highly trained and efficient citizens of the United States and that the United States Navy and the merchant marine of the United States should work closely together to promote the maximum integration of the total seapower forces of the United States. In furtherance of this policy -

(1) the Secretary of Transportation is authorized to take the steps necessary to provide for the education and training of citizens of the United States who are capable of providing for the safe and efficient operation of the merchant marine of the United States at all times and as a naval and military auxiliary in time of war or national emergency; and

# THE PRACTICE OF RITUAL DEFAMATION
## HOW VALUES, OPINIONS AND BELIEFS ARE CONTROLLED IN DEMOCRATIC SOCIETIES.

Laird Wilcox,[88] 1990

Defamation is the destruction or attempted destruction of the reputation, status, character or standing in the community of a person or group of persons by unfair, wrongful, or malicious speech or publication.

For the purposes of this essay, the central element is defamation in retaliation for the real or imagined attitudes, opinions or beliefs of the victim, with the intention of silencing or neutralizing his or her influence, and/or making an example of them so as to discourage similar independence and "insensitivity" or non-observance of taboos.

It is different in nature and degree from simple criticism or disagreement in that it is aggressive, organized and skillfully applied, often by an organization or representative of a special interest group, and in that it consists of several characteristic elements.

Ritual Defamation is not ritualistic because it follows any prescribed religious or mystical doctrine, nor is it embraced in any particular document or scripture. Rather, it is ritualistic because it follows a predictable, stereotyped pattern which embraces a number of elements, as in a ritual.

| THE ELEMENTS OF A RITUAL DEFAMATION ARE THESE: | PLAINTIFF'S COMMENTS |
|---|---|
| 1. In a ritual defamation the victim must have violated a particular taboo in some way, usually by expressing or identifying with a forbidden attitude, opinion or belief. It is not necessary that he "do" anything about it or undertake any particular course of action, only that he engage in some form of communication or expression. | Plaintiff stood up in defense against abusive workplace practices and used his computer expertise to find a violation of federal law and company policies. |
| 2. The method of attack in a ritual defamation is to assail the character of the victim, and never to offer more than a perfunctory challenge to the particular attitudes, opinions or beliefs expressed or implied. Character assassination is its primary tool. | This is exactly what transpired. And the very first day the Plaintiff was on what the master admittedly say the Plaintiff sitting on a stool. Rather than to approach the Plaintiff to inquire as to why the master made a wrongful presumption and left corrective action to the third mate. The master's faulty presumption permeated to the chief mate and the boatswain. |

---

[88] The author apparently issued two versions of this article, on longer than the other. There article presented herein is a combined version of those two different versions. The two versions are available online at: http://www.lairdwilcox.com/Ritual Defamation_files/defame.htm, - and at: http://www.talkabouttaxes.com/group/can.taxes/messages/80711.html

3. An important rule in ritual defamation is to avoid engaging in any kind of debate over the truthfulness or reasonableness of what has been expressed, only condemn it. To debate opens the issue up for examination and discussion of its merits, and to consider the evidence that may support it, which is just what the ritual defamer is trying to avoid. The primary goal of a ritual defamation is censorship and repression.

The Union Grievance Process exacerbates the ritual defamation as general, non-sexual harassment or bullying is not taken seriously.

4. The victim is often somebody in the public eye - someone who is vulnerable to public opinion - although perhaps in a very modest way. It could be a schoolteacher, writer, businessman, minor official, or merely an outspoken citizen. In visibility enhances vulnerability to ritual defamation.

The Plaintiff is, in the strict sense, in the public eye because he has a civil case in the federal courts for the Second Amendment rights of American merchant seaman as other cases against shipping companies over harassment and bullying.

5. An attempt, often successful, is made to involve others in the defamation. In the case of a public official, other public officials will be urged to denounce the offender. In the case of a student, other students will be called upon, and so on.

The Third Mate rallied behind the master when he belated informed the master of the Plaintiff alleged leaving the bridge without permission when if the Third Mate at the time felt the incident did not rise to the level of informing the master.

6. In order for a ritual defamation to be effective, the victim must be dehumanized to the extent that he becomes identical with the offending attitude, opinion or belief, and in a manner which distorts it to the point where it appears at its most extreme . . .

The master assigned U.S. Navy security detail to post a guard at the Plaintiff quarters to insure the Plaintiff is confined to quarters (exception being to escort the Plaintiff to and from meals).

7. Also to be successful, a ritual defamation must bring pressure and humiliation on the victim from every quarter, including family and friends. If the victim has school children, they may be taunted and ridiculed as a consequence of adverse publicity. **If they are employed, they may be fired from their job.** If the victim belongs to clubs or associations, other members may be urged to expel them.

Being escorted by a military guard in the crew mess presents the Plaintiff with "humiliation from every quarter" of those on the ship.

8. Anyone who defends a victim runs the risk of being associated with him and similarly defamed. Even if their own reputation is beyond question, their judgment and involvement with the victim may become an issue. Often, the victim of a ritual defamation becomes isolated and abandoned.

Plaintiff witnessed this to be true because fellow crewmemers who once engaged conversations with the Plaintiff disassociated with the Plaintiff when the Plaintiff was being escorted.

9. Any explanation the victim may offer, including the claim of being misunderstood, is considered irrelevant. To claim truth as a defense for a politically incorrect value, opinion or belief is interpreted as defiance and only compounds the problem. Ritual defamation is often not necessarily an issue of being wrong or incorrect but rather of "insensitivity" and failing to observe social taboos.

The Plaintiff failed to persuade the master that his condition was not a medical but an athletic condition in need of simple exercise. The same treatment as if being guilty of something persisted.

10. Many victims succumb early and go through a "confessional" stage complete with apologies and even remorse. They may even denounce friends associated with the forbidden attitudes, opinions and beliefs, or claim they were "duped", as was the case with many suspected "subversives" during the McCarthy era. If the charges against them involve "morals", they may claim stress or mental illness as a defence.

Limiting this to the industrial workplace environment the Plaintiff did not go through a "confessional" stage because he knew the conduct of the officers and the boatswain's were illegal. The Plaintiff new the federal laws on job discrimination, civil rights, and crimes which gave him the personal authority to stand up against the abusive treatment for himself and in defense of that under-age girl in that child porn photograph on moral and religious reasons.

11. The viciousness of ritual defamation is inspired not merely be revenge - although that is an important factor - but also to create an example so others will know of the savaging they can expect for stepping out of line. Ritual defamation is an important means of social control.

This type of social control is illegal. It is this that the civil rights law is based upon. It can be alleged that for a master to take such extreme measures concerning and incident where the Plaintiff had reasonable justification implies there was something the master did not want the Plaintiff to find. The master fired the Plaintiff.

12. An interesting aspect of ritual defamation is its universality. It is not specific to any particular value, opinion or belief or to any group or sub-culture. It may be used for or against any political, ethnic, or religious minority and also by any political, ethnic or religious minority.

Ritual defamation was used against the Plaintiff to protect the master and the company from a criminal investigation over child porn that existed on the U.S. Government computer for 5 years. That fact would have exonerated the master and the company if negligence were not a factor but now they are vulnerable to the allegation of complicity for taking action to coverup the facts.

46

13. The power of ritual defamation lies entirely in its capacity to intimidate. It embraces some elements of primitive superstitious belief, as in a "curse" or "hex". It also plays on the subconscious fear most people have of being rejected by the "tribe" and being cut off from social and psychological support systems.

   Only the truly courageous and independent person can withstand the full force of a ritual defamation, and occasionally they may even survive such an attempt relatively unscathed.

14. The weak points of ritual defamation lie in its tendency toward over-kill and in its rather transparent maliciousness.

   Occasionally, a ritual defamation will fail because of inadequate planning and failure to correctly estimate the vulnerability of the victim.

   Ritual defamers often exhibit extensive projective mechanisms and delusions of persecution themselves. Although it may appear to be an offensive maneuver, it's actually quite defensive in nature.

   Eric Hoffer said, "You can discover what your enemy fears most by observing the means he uses to frighten you." The True Believer, 1951

Knowing the federal civil rights law, and the laws on defamation and job discrimination gave the Plaintiff the moral and legal strength to stand up against the abusive treatment imparted upon him by the master.

It is Plaintiff's character and religious beliefs that when he is in the right that he will not back down in a confrontation. That he will do the right thing in all things has from time to time gotten him into trouble because he did not cower in the face of such ritual defamation.

Over-kill is exactly what the master of USNS FISHER did to the Plaintiff.

The master had already completed the paperwork firing the Plaintiff before the meeting was even held. This procedure is a breach of the contract (agreement) with the union's grievance procedure and the company's policy on harassment. The meeting with the master was not conducted fairly nor without bias. The Plaintiff was given no opportunity to given his defense. He was essentially *keel-hauled* for no good reason.

Apparently what this master fears most is an a crewmember educated in the law.

15. Paradoxically, a ritual defamation often brings about the very attitudes, opinions and beliefs that it condemns, as in a self-fulfilling prophecy. It enhances paranoia and hatred and generally serves to divide and alienate. It hardens positions and polarizes a situation as nothing else can.

A person accused of supporting a particular belief may find them selves propelled into that position. Politically, for example, it's quite effective in creating rebels and dissidents.

It has been used in various forms by dictatorships and totalitarian systems all throughout history. In democratic societies it has become a favorite tool of special interest groups to vilify and neutralize their critics and opponents.

Such as what happened to the Plaintiff when he frequently found himself aboard ships where harassment and bullying was the style of management. The frequency of this incidents over the years cause the Plaintiff to educate himself in the law in order that he my defend himself more efficiently.

But the mere act of standing up to explain the situation is frequently view as insubordination which as in itself an abuse of authority which leads to the victim-crewmember's firing. It becomes a damned if you do, and damned if you don't situation.

The Plaintiff finds it surprising that more instances of assault and battery against ship's officers do not occur more frequently as is noted for the instances of harassment and bullying. Perhaps a sailor's form of justice *ought* to be imposed.

An interesting aspect of ritual defamation as a practice is its universality. It is not specific to any value, opinion or belief or to any group or subculture. It may be used for or against any political, ethnic, national or religious group. It may, for example, by anti-Semites against Jews, or by Jews against anti-Semites; by rightists against leftists or by leftists against rightists, and so on.

The power of ritual defamation lies entirely in its capacity to intimidate and terrorize. It embraces some elements of primitive superstitious belief, as in a "curse" or "hex." It plays into the subconscious fear most people have of being abandoned or rejected by the tribe or by society and being cut off from social and psychological support systems.

The weakness of ritual defamation lies in its tendency toward overkill and in its obvious maliciousness. Occasionally a ritual defamation will fail because of poor planning and failure to correctly judge the vulnerability of the victim or because its viciousness inadvertently generates sympathy.

It's important to recognize and identify the patterns of a ritual defamation. Like all propaganda and disinformation campaigns it is accomplished primarily through the manipulation of words and symbols. It is not used to persuade, but to punish. Although it may have cognitive elements, its thrust is primarily emotional. Ritual Defamation is used to hurt, to intimidate, to destroy, and to persecute, and to avoid the dialogue, debate and discussion upon which a free society depends. On those grounds it must be opposed no matter who tries to justify its use.

# THE NATURE OF THE RELIEF SOUGHT

**Contract Actions** (22 Am Jur 2d § 822 - Footnotes omitted)

In a contract action, the plaintiff must allege and prove such essential matters of fact as are necessary to show that he has sustained actual damages by the breach of a contract. And in a breach of contract action for damages beyond nominal damages, the plaintiff must show a compensable injury resulting from the alleged breach of the pleaded contract.

Allegations that the plaintiff and defendant entered into the contract set forth in the complaint and that the defendant committed a breach of it from which the plaintiff sustained damages are sufficient to constitute a cause of action. A complaint setting out a breach of a valid contract is a statement of a cause of action for nominal damages, even though there is no allegation of compensatory damages. But a motion by the defendant for the direction of a verdict for the plaintiff for nominal damages on the pleadings should not be granted if under any reasonable construction of the complaint the plaintiff is entitled to substantial damages.

**Punitive Damages** (45C Am Jur 2d § 2660 - Footnotes omitted)

An award of punitive damages is appropriate in certain discrimination cases to punish the wrongdoer for outrageous conduct, and to deter others from engaging in similar conduct; however, an award of such damages must be supported by the record and may not constitute a windfall to the prevailing party. In enacting the provision of the Civil Rights Act of 1991 governing damages in cases of intentional discrimination in employment, Congress sought to expand the available remedies by permitting the recovery of compensatory and punitive damages in addition to previously available remedies, such as front pay.

Punitive damages are available as a remedy for victims of intentional discrimination under various federal job discrimination statutes, including Title VII of the Civil Rights Act of 1964.

THEREFORE: Due to the severity and the nature and variety of damages suffered by the Plaintiff in this case the Plaintiff seeks $1 million for compensatory damages, both pecuniary and humiliation, in addition to punitive and nominal damages, and Front Pay.

RESPECTFULLY SUBMITTED

_____ (Pro Se)
Don Hamrick
5860 Wilburn Road
Wilburn, AR 72179

## CERTIFICATE OF SERVICE

I, Don Hamrick, Appellant, hereby certify that, on October 5, 2005, in accordance with Rule 4(c)(2) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1916, Seaman's Suit, I have hereby submitted this complaint with Appendixes to the U.S. District Court for the District of Columbia such that two copies are to be filed with the Court and the remainder copies to be delivered with Summons to the Respondents by a Court appointed U.S. Marshal in due regard that one Respondent refused to provided a mailing address to the Plaintiff for the purpose of service of Summons with the Complaint by the Plaintiff in addition to the fact that the Plaintiff cannot afford the cost of service.

An additional copy is provided for the Attorney General, Alberto Gonzales on the basis that the Military Sealift Command is a named Respondent.

Don Hamrick
5860 Wilburn Road
Wilburn, Arkansas 72179
Email: ki5ss@yahoo.com

50