# APPENDIX 4 CASE PRECEDENCE ON BULLYING IN THE WORKPLACE

# Zimmerman, et al. v. Direct Federal Credit Union, et al.
# Verdict For Workplace Bullying Is Upheld

## Bias Claim Fails, But Plaintiff Gets $730K

By Wendy L. Pfaffenbach
Massachusetts Lawyers Weekly
November 27, 2000
Cite this Page: 29 M.L.W. 731

An employee could collect $730,000 from her company for workplace "bullying" and retaliation -- even though her earlier claim for gender-bias was ultimately rejected by a jury, a US magistrate judge has ruled.

The defendant company and its president argued that the evidence failed to support a punitive damages award based on the plaintiff's retaliation claim, or that they intentionally interfered with the plaintiff's employment contract after she filed the bias claim.

But Chief U.S. Magistrate Judge Robert B. Collings disagreed, upholding the jury's award of $130,000 for intentional interference with advantageous relations, and $400,000 in punitive damages against both defendants. The $200,000 verdict based on the plaintiff's retaliation claim was not challenged by the defendants.

"[A] reasonable jury could readily conclude that [the president] acted with a vindictive motive and that he ... undertook a deliberate, calculated, systematic campaign to humiliate and degrade [the plaintiff] both professionally and personally," the judge wrote.

The 39-page decision is Zimmerman, et al. v. Direct Federal Credit Union, et al., Lawyers Weekly No. 05-050-00.

## RETALIATION WINS

Juliane Balliro of Boston, counsel for the plaintiff, remarked that the decision "makes a strong statement against work-place bullying."

Balliro said when an employee files a discrimination complaint, the employer often may "unwittingly or intentionally" use the complaint as a shield.

"[But] this case went one step further and [the complaint] was used as a club to drive [the plaintiff] from the office," she remarked.

A. Van C. Lanckton of Boston, counsel for the defendants, said the decision indicates that employers must realize that although they may treat an employee fairly, a jury could still find retaliation absent discrimination.

"The employer very appropriately knew his responsibility to take no adverse action when someone has filed a claim for discrimination, even when he believed -- and the jury vindicated him -- that there was no discrimination," he remarked.

Boston employment law expert Dahlia C. Rudavsky said more and more cases involve a plaintiff recovering for retaliation, despite the failure of a bias claim.

"If you look at the statistics coming out of the [Massachusetts Commission Against Discrimination] it seems to be a frequent outcome," observed Rudavsky, who represents employees.

Balliro agreed that such cases are becoming more common.

05 1993
FILED
OCT - 7 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

"You are seeing more retaliation claims brought because plaintiffs are starting to stay in the work place longer than they did in the past," she stated. Rudavsky remarked that retaliation claims also may be easier to prove than discrimination claims.

"It has to do with the difficulty of proving discrimination. Sometimes the evidence is hard to get at. In many cases you are dealing with motives that are hard to discern and a jury may be uncertain as to what happened," she said. "In retaliation, you can look at before and after."

## ANGRY EMPLOYER

The plaintiff, Celia G. Zimmerman, filed a complaint at MCAD against the defendants, Direct Federal Credit Union, and its president and CEO, David Breslin.

Shortly after delivering her complaint to Breslin, the plaintiff alleged that her situation at the credit union deteriorated.

For example, although the plaintiff, as a member of management, had regularly attended annual meetings, she was not asked to attend the annual meeting in March 1997.

When the plaintiff was called upon to attend meetings, she testified that her attempts to participate in the meetings were ignored by Breslin.

After the plaintiff gave notice of her intention to pursue her discrimination claim in court, a company meeting was called in which Breslin spoke about "integrity" and commented that he would have expected some employees would have already left the employ of the credit union.

The plaintiff and some fellow employees testified that they believed these comments were directed specifically at her.

In November 1997, the plaintiff was asked to give a presentation at a board meeting. Breslin updated the members of the board on the status of the plaintiff's lawsuit immediately before she made her presentation.

After this incident, the plaintiff never attended another board meeting.

In early 1998, the plaintiff was assigned the goal of improving the compliance function at the credit union.

To complete this task, she attended a compliance training course aimed at all areas of compliance issues, including year 2000 compliance.

However, when the credit union formed a team to deal with year 2000 issues, the plaintiff was assigned the task of doing spreadsheets.

In early December 1996, the plaintiff began keeping a journal. In 1997, she learned that she would have to produce the diary to the defendants during the discovery phase of litigation.

The diary contained passages describing conversations the plaintiff had with her co-workers in which they expressed sympathy for her situation.

After the diary was produced, the plaintiff testified that she witnessed senior managers and other people who were mentioned in the diary being called into the defendant's office, and leaving "visibly shaken."

After these events, the plaintiff alleged that she began to feel overwhelmed and unable to concentrate.

Following a trial in the U.S. District Court, a jury returned a verdict that the defendants did not commit gender or pregnancy discrimination, nor did they violate the Family Medical Leave Act. It also rejected a loss of consortium claim asserted by James Zimmerman, the plaintiff's husband.

The plaintiff, however, was awarded $200,000 in compensatory damages on her state law retaliation claim against the two defendants, $400,000 in punitive damages jointly and severally against both defendants, and $130,000 in damages on her claim for intentional interference with advantageous relations against Breslin.

Subsequently, the defendants filed a motion under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law with respect to the tortious interference claim and the award of

punitive damages. In the alternative, they sought either a new trial on the tort and punitive damages claims, or an order of remittitur on the $400,000 award.

## VALID VERDICT

According to Collings, Breslin had argued that the plaintiff failed to prove that any of his actions, as a corporate officer and the plaintiff's ultimate superior, were "improper in motive or means" thus constituting an intentional interference with contractual relations.

Massachusetts law, the judge noted, seeks to protect a corporate officer's freedom of action by requiring proof that he acted with "actual malice."

Collings, however, reasoned that ample evidence supported the jury's conclusion.

"The bottom line is that the jury concluded that [the defendant] engaged in unlawful conduct," he wrote. "Such actions quite simply cannot be viewed as falling either within the legitimate scope of a corporate officer's employment or within the corporation's legitimate interests."

The defendants' contention that no legally sufficient evidence supported the punitive damage awards was equally unpersuasive, Collings stated.

"[T]o overturn the punitive damages award in this case would render hollow any assertion that juries have discretion as to whether to award punitive damages," the judge said.

Collings concluded that the jury had sufficient information to calculate the punitive damages award. The judge spurned the argument by Breslin that because no information was elicited at trial regarding his assets or income, the jury was not in a position to calculate the individual punitive damage award against him.

## NEW TRIAL OR REMITTITUR

Collings also denied the defendants' motions for new trial and remittitur.

The judge noted that although the defendants sought a new trial on the intentional interference claims and punitive damage claims, their arguments in this matter were indistinguishable from those made in support of the motion for judgment as a matter of law.

As for remittitur, Collings stated that the Supreme Judicial Court in its 1997 decision of Labonte v. Hutchins & Wheeler delineated factors to consider when examining a punitive damage award, including the reprehensibility of the defendant's conduct; the ratio of the award to the plaintiff's actual harm; and the difference between the actual and punitive damages.

In light of those factors, the judge concluded that the award was permissible.

"In all the circumstances of the case, a remittitur is not warranted," Collings held.